# EXHIBIT D-3

Case3:05-cv-00646-EMC   Document209-2   Filed12/14/09   Page2 of 67

# Ng Eng Ghee and others
### v
# Mamata Kapildev Dave and others
# (Horizon Partners Pte Ltd, intervener)
# and another appeal

## [2009] SGCA 30

Court of Appeal — Civil Appeal Nos 119 and 120 of 2008 (Originating Summonses Nos 10 and 11 of 2008)
Chan Sek Keong CJ, Andrew Phang Boon Leong JA and V K Rajah JA
3 February; 25 May 2009

*Civil Procedure — Costs — Dismissal of application for collective sale order based on technical non-compliance — Appeals to High Court and Court of Appeal — Appellants having separate representation in proceedings below and in Court of Appeal — Some parties to proceedings below choosing not to participate in appeal — Some appellants appearing in person — Intervener participating in proceedings — Whether non-appealing parties' costs of proceedings below recoverable — Whether appellants entitled to one set of costs each — Whether costs should be awarded for proceedings pertaining to technical non-compliance — Whether standard or indemnity basis — Whether in-person litigants entitled to costs — Whether appellants' counsel entitled to costs of three counsel — Whether intervening party liable for costs — Order 59 r 18A Rules of Court (Cap 322, R 5, 2006 Rev Ed)*

*Land — Strata Titles — Substantial interest accumulating on deposit paid under Collective Sale Agreement — Strata Titles' Board's order for collective sale set aside at appellate level — Whether objecting subsidiary proprietors entitled to share of interest*

### Facts

This case was about the costs orders in two appeals, Civil Appeal No 119 of 2008 ("CA 119/2008") and Civil Appeal No 120 of 2008 ("CA 120/2008") (collectively "the Appeals"), arising from the collective sale of a condominium development ("Horizon Towers"). (Judgment in the appeals was given in *Ng Eng Ghee v Mamata Kapildev Dave* [2009] 3 SLR 109 ("*Ng Eng Ghee*").) An application for the collective sale of Horizon Towers had been made to the Strata Titles Board ("the Horizon Board"). At the end of the first tranche of proceedings before the Horizon Board ("the First Tranche of the Horizon Board proceedings") (at which the objecting subsidiary proprietors were represented by two separate counsel, Harry Elias Partnership ("HEP") and Tan Kok Quan Partnership ("TKQ")), the application for collective sale was dismissed on the technical basis that three pages comprising the execution pages of three consenting subsidiary proprietors were not attached to the application. In Originating Summons No 1269 of 2007 ("OS 1269/2007"), the High Court allowed the majority owners' appeal against the Horizon Board's decision and remitted the matter to the Horizon Board, leaving the issue of costs to be heard at a later date.

The Horizon Board granted the application for collective sale at the end of the second tranche of proceedings ("the Second Tranche of the Horizon Board

proceedings") (at which the two sets of objecting subsidiary proprietors were again respectively represented by HEP and TKQ). The objecting subsidiary proprietors' appeal to the High Court ("the High Court proceedings") (at which the objecting subsidiary proprietors formerly represented by TKQ appeared in person) was dismissed. Several objecting subsidiary proprietors who were formerly represented by TKQ in the High Court proceedings chose not to appeal to the Court of Appeal but those represented by HEP filed CA 119/2008 and the rest of the objecting subsidiary proprietors formerly represented by TKQ filed CA 120/2008.

The issues before the Court of Appeal in the present case were, *inter alia*: whether two of the objecting subsidiary proprietors who had chosen not to appeal ("the non-appealing parties") should be awarded the costs of the proceedings below; whether the appellants in the Appeals were entitled one set of costs each; whether HEP was entitled to the costs of three counsel; and whether the intervener (which was represented in OS 1269/2007, the High Court proceedings, as well as the Appeals) should share the liability for costs. Another issue which surfaced was whether the objecting subsidiary proprietors were entitled to a share of the interest that had accumulated on the deposit paid for the purchase of Horizon Towers.

**Held, giving the costs orders set out in [43] of the judgment:**

(1)    Where a lower court or tribunal had made a decision against two or more parties with overlapping interests and the appeal succeeded on grounds earlier raised by parties who had chosen not to appeal, the court had the power to order payment to the non-appealing party under O 59 r 4 and O 57 r 13 of the Rules of Court (Cap 322, R 5, 2006 Rev Ed). However, there was no general rule that all parties to proceedings in a lower court would ordinarily be able to receive their costs incurred in the lower court if that court's decision was ultimately overturned at the appellate level: at [11] and [13] to [15].

(2)    The non-appealing parties were entitled to recover costs for the Second Tranche of the Horizon Board proceedings and the High Court proceedings, because: they had expended substantial time, effort and money in contributing to the final success of the appeals; the Court of Appeal's decision in *Ng Eng Ghee* affirmed their position on issues that they had consistently raised in the Horizon Board proceedings and the High Court proceedings; it would be illogical and inequitable if the decisions of the Horizon Board and the High Court were overturned only for the benefit of the objecting subsidiary proprietors who appeared in the Court of Appeal as all the objecting subsidiary proprietors shared an indivisible community of interests in the proceedings below; and the non-appealing parties should not have to suffer out-of-pocket expenses because they wanted to right a wrong done to them and their neighbours. Given the significant costs incurred at every step of these bitterly fought proceedings, it was not unreasonable for some of the objecting subsidiary proprietors to have foregone their appellate participation before the Court of Appeal: at [8], [17] and [18].

(3)    The right to separate counsel did not invariably carry with it an entitlement to recover all the attendant legal costs incurred. This right had to be balanced against the desirability of not unduly penalising the losing party by

visiting it with unreasonably incurred costs. Each determination of whether to award more than one set of costs would have to turn on the facts of the case and the court ought to take into consideration all relevant factors, including: (a) the degree of the community of interests existing among the parties; (b) the size of the sum or the importance of the interest that was the subject matter of the dispute; and (c) the degree of overlap in the pre-hearing preparations and conduct of proceedings. In general, the greater the community of interest, the less inclined the court would be to grant separate costs for separate representation: at [22] and [24].

(4)    The key consideration in the present matter was whether there was an unnecessary duplication of work and/or wastage of time as a result of the appellants' separate representation. Although both sets of appellants had raised the issue of good faith, they had from the outset differentiated themselves in their cross-examination of witnesses and in the approaches adopted in their submissions. Thus, the appellants in CA 119/2008 and CA 120/2008 were entitled to separate sets of costs for the Second Tranche of the Horizon Board proceedings, the High Court proceedings as well as their respective appeals with an appropriate diminution of the quantum to take into account duplication of work, legal relevance and the cogency of the contentions advanced: at [26] to [28].

(5)    Section 84A(7C) of the Land Titles (Strata) Act (Cap 158, 1999 Rev Ed) which dealt specifically with situations of technical non-compliance with the procedural requirements of an application for collective sale only came into effect after the First Tranche of the Horizon Board proceedings. Thus, no order for costs for the First Tranche of the Horizon Board proceedings and OS 1269/2007 was made: at [30].

(6)    Although different aspects of the respondents' conduct merited varying degrees of criticism, the matters alleged by the appellants did not compel a departure from the usual basis of costs: at [32].

(7)    The appellants in CA 120/2008 were entitled under Order 59 rule 18A of the Rules of Court to such costs of the appeal and the High Court proceedings as would reasonably compensate them for the time expended by them, together with all expenses reasonably incurred. The same entitlement applied to the non-appealing parties in respect of the High Court proceedings: at [34].

(8)    The appellants in CA 119/2008 were entitled to the costs of only two counsel for CA 119/2008, the Horizon Board proceedings and the High Court proceedings, because TKQ and Mr Darmawan (who appeared in person for the appellants in CA 120/2008) had in fact helped to develop many of the issues on good faith that took centre stage in these proceedings: at [36].

(9)    The costs ordered against the respondents for the High Court proceedings and the Appeals were to be borne equally by the intervener and the respondents, as the intervener had taken the lead in the High Court proceedings in defending the Horizon Board's decision to make an order for the collective sale and had engendered the continuation of the dispute by filing proceedings against the majority owners for an alleged failure to fulfil their contractual obligation to obtain a collective sale order: at [37] and [39].

(10)  The interest on the deposit was to be shared by all the subsidiary proprietors. Whether or not the objecting subsidiary proprietors were entitled to enforce the sale and purchase agreement was irrelevant because the purchase consideration had been paid by the intervener for all the units in Horizon Towers and not merely those owned by the consenting subsidiary proprietors. The setting aside of the sale to the respondents was also irrelevant, as the right to interest was an accrued right and not dependent on the actual performance of the sale and purchase agreement: at [41] and [42].

**Case(s) referred to**

   *Harbin v Masterman* [1896] 1 Ch 351 (refd)

   *Harold v Smith* (1860) 5 H & N 381; 157 ER 1229 (refd)

   *Heng Holdings SEA (Pte) Ltd v Tomongo Shipping Co Ltd (No 2)* [1997] 3 SLR 919 (refd)

   *Ng Eng Ghee v Mamata Kapildev Dave* [2009] 3 SLR 109 (refd)

   *Smith v Buller* (1875) LR 19 Eq 473 (refd)

   *Tan Harry v Teo Chee Yeow Aloysius* [2004] 1 SLR 513 (distd)

   *Teo Chee Yeow v Tan Harry* [2004] 3 SLR 588 (distd)

   *Tullio v Maoro* [1994] 2 SLR 489 (refd)

   *Wing Joo Loong Ginseng Hong (Singapore) Co Pte Ltd v Qinghai Xinyuan Foreign Trade Co Ltd* [2009] 2 SLR 814 (refd)

**Legislation referred to**

   Land Titles (Strata) Act (Cap 158, 1999 Rev Ed) s 84A(7C)

   Rules of Court (Cap 322, R 5, 2006 Rev Ed) O 57 r 13, O 59 rr 2(2), 3(2), 4, 7, 8, 18A, 19(1), 27(1), 27(2), 27(3), Appendix 1 para 1

*Harry Elias SC, Philip Fong, Justin Chia and Kylie Peh (Harry Elias Partnership) for the appellants in CA 119/2008;*
*Rudy Darmawan (in person) for the appellants in CA 120/2008;*
*C R Rajah SC, Karthigesu Anand Thiyagarajah, Burton Chen and Lalitha Rajah (Tan Rajah & Cheah) for the respondents;*
*Ang Cheng Hock SC, Corina Song, William Ong and Loong Tse Chuan (Allen & Gledhill LLP) for the interveners.*

7 July 2009                                      Judgment reserved.

**V K Rajah JA (delivering the judgment of the court):**

### Introduction

1      The right to recover legal costs is especially significant when considerable costs have been incurred in a dispute where one party has deeper pockets than the other. Costs rules and awards could in such circumstances have a profound impact on the final outcome of the legal proceedings. A party's vindication on the merits may prove to be hollow if the fruits of success are soured by uncompensated costs. The primary

objective of a costs order is to *compensate* the successful party for all *reasonable* costs incurred rather than to punish the unsuccessful party. Nevertheless, it is trite law that the court may exercise its discretion to give different costs orders on the basis of what it thinks is fair and just. In adjudicating on costs, the court also has to bear in mind that unmerited barriers in the path of recovering reasonably incurred costs might well have the chilling effect of deterring parties, in future, from legitimately pursuing or defending their rights.

2     This judgment is in relation to the cost orders to be made for Civil Appeal No 119 of 2008 ("CA 119/2008") and Civil Appeal No 120 of 2008 ("CA 120/2008") (collectively referred to as "the Appeals") relating to the collective sale of the development known as "Horizon Towers". We gave judgment in the Appeals in favour of the appellants on 2 April 2009 (see *Ng Eng Ghee v Mamata Kapildev Dave* [2009] 3 SLR 109 ("*Ng Eng Ghee*")). At the conclusion of our judgment (*ie, Ng Eng Ghee*), we invited the parties to address us on the various possible costs permutations that ought to follow our various findings. The parties (as well as two objecting subsidiary proprietors owning a single unit, Then Khek Koon and Tan Kim Lian Jasmine, who had appeared in the High Court proceedings but did not appeal to this court (collectively referred to as "the non-appealing parties")), responded vigorously to our request. After considering their submissions, we now give our decision.

### Factual matrix

3     The material facts have been fully elaborated in our judgment in *Ng Eng Ghee*, and we need not repeat them in the present judgment in full. For ease of reference, in this judgment, we shall adopt the same references to the parties that we had earlier employed in *Ng Eng Ghee*. Needless to say, the present judgment and *Ng Eng Ghee* ought to be read together as the present judgment is the corollary of *Ng Eng Ghee*. For present purposes, however, it should be recalled that the identity of the applicants for the collective sale had changed twice in the course of the Strata Titles Board ("the Horizon Board") proceedings (in July to August 2007 ("the First Tranche") and October to November 2007 ("the Second Tranche") (collectively referred to as "the Horizon Board proceedings") before the respondents in the Appeals were substituted for the earlier applicants in the application for the collective sale. For this reason, we will refer to the earlier applicants for the collective sale as "the majority owners". Where, from time to time, we intend to refer to those who consented to the collective sale generally, we will use the term "consenting subsidiary proprietors". Broadly speaking, however, both of these terms refer to the same persons.

4     It should also be remembered that various proceedings involving the parties to the Appeals and other parties had been concluded prior to the filing of the Appeals. It is pertinent, for the purposes of assessing costs, that

not all of the parties had been involved in each of these earlier proceedings. By way of a quick illustration, we need only mention that the intervener, Horizon Partners Pte Ltd, was not allowed to be heard in the Horizon Board proceedings. Therefore, to facilitate understanding, we think it will be helpful to tabulate an outline of all of the parties' actual involvement at the various stages of the dispute, up to and including the Appeals:

| Stage of proceedings | Relevant parties | Counsel |
| --- | --- | --- |
| The Horizon Board proceedings (ie, the First Tranche and the Second Tranche) | The majority owners | M/s Tan Rajah & Cheah ("TRC") |
| | The appellants in CA 119/2008 | M/s Harry Elias Partnership ("HEP") |
| | The appellants in CA 120/2008 and the non-appealing parties | M/s Tan Kok Quan Partnership ("TKQ") |
| The appeal by way of Originating Summons No 1269 of 2007 ("OS 1269/2007") to the High Court against the Horizon Board's decision after the First Tranche to dismiss the application for a collective sale on the ground that the application was technically irregular | The majority owners | TRC |
| | The appellants in CA 119/2008 | HEP |
| | The appellants in CA 120/2008 and the non-appealing parties | TKQ |
| | The intervener in the Appeals | M/s Allen & Gledhill LLP ("A&G") |
| The appeals by the objecting subsidiary proprietors by way of Originating Summonses Nos 10 of 2008 and 11 of 2008 to the High Court against the Horizon Board's decision in October 2007 to allow the application for a collective sale ("the High Court Proceedings"), which led to the appeals | The respondents in the Appeals | TRC |
| | The appellants in CA 119/2008 | HEP |
| | The appellants in CA 120/2008 and the non-appealing parties | All in person |
| | The intervener in the Appeals | A&G |

| Stage of proceedings | Relevant parties | Counsel |
|---|---|---|
| The appeals against the decision in the High Court proceedings to uphold the Horizon Board's order for a collective sale (*ie*, the Appeals) | The respondents in the Appeals | TRC |
| | The appellants in CA 119/2008 | HEP |
| | The appellants in CA 120/2008 | In person |
| | The intervener in the Appeals | A&G |

### Issues to be considered

5    In arriving at our final cost orders we had to primarily determine: (a) who is entitled to costs; (b) what costs are recoverable; and (c) who is liable to pay costs.

### The costs indemnity principle

6    Before we discuss the issues set out in [5] above, it is important to recall the general rule in Singapore, *viz*, that costs should follow the event except in special circumstances (see *Singapore Civil Procedure 2007* (GP Selvam gen ed) (Sweet & Maxwell Asia, 2007) ("*Singapore Civil Procedure 2007*") at paras 59/3/1 and 59/3/5; see also *Tullio v Maoro* [1994] 2 SLR 489). This principle (*ie*, that an unsuccessful party would generally be ordered to pay the successful party's reasonable litigation costs) has been sometimes termed "the indemnity principle". It is not to be confused with costs on "the indemnity basis", which would be costs taxed on the basis that any doubts as to their reasonableness are to be resolved in favour of the receiving party (O 59 r 27(3) of the Rules of Court (Cap 322, R 5, 2006 Rev Ed) ("the Rules")), as the alternative to costs on "the standard basis", where any doubts as to reasonableness is to be resolved in favour of the paying party (see O 59 rr 27(1) and 27(2) of the Rules).

7    The fundamental conception of costs which underlies the indemnity principle is that costs are imposed to *compensate* the successful party and not to punish the losing party (although costs may sometimes be imposed as a punishment for improper or unreasonable behaviour in the proceedings; see, *eg*, O 59 rr 7 and 8 of the Rules). As Bramwell B astutely noted in *Harold v Smith* (1860) 5 H & N 381 (at 385); 157 ER 1229 (at 1231):

> Costs as between party and party are given by the law as an indemnity to the person entitled to them : they are not imposed as a punishment on the party who pays them, nor given as a bonus to the party who receives them. Therefore, if the extent of the damnification can be found out, the extent to which costs ought to be allowed is also ascertained.

To this we should add that the indemnity principle as applied in Singapore rests on one bedrock feature. It only extends to *costs reasonably incurred and not all costs incurred*. Therefore, the principle, does not, in practice, amount to a full and complete indemnity to the successful party against all the expenses to which he has incurred in relation to the proceedings (see *Singapore Civil Procedure 2007* at para 59/27/5) unless this has been *contractually agreed upon* or *if the court makes a special order in exceptional circumstances*.

**Parties entitled to costs**

*Entitlement of the non-appealing parties to costs*

*The submissions*

8    The appellants in CA 120/2008 and the non-appealing parties submitted that the non-appealing parties should be awarded costs for the following reasons:

(a)    This court has the power to award such costs on the basis of O 59 rr 2(2) and 3(2) of the Rules.

(b)    The non-appealing parties expended substantial time, effort and money in building and contributing to the final success of the Appeals; *eg*, through the cross-examination of the applicant's witnesses in the Horizon Board proceedings.

(c)    This court's decision in *Ng Eng Ghee* ([2] *supra*) affirmed the non-appealing parties' position on issues that they had consistently raised in the Horizon Board proceedings and the High Court proceedings.

(d)    This court's decision in *Ng Eng Ghee* reversed the decisions of the Horizon Board and the High Court. It would be illogical and inequitable if those decisions (including the costs orders) were overturned only for the benefit of the objecting subsidiary proprietors who appeared before this court but not all those who appeared below. All of them shared an indivisible community of interests in the proceedings below, in that any decision regarding the collective sale order would simultaneously affect the ability of each and every one of them to retain their homes.

(e)    This court should give effect to its finding of bad faith *apropos* the *en bloc* sale of Horizon Towers by compensating all those who had contributed towards the build-up of the case.

(f)    The non-appealing parties should not have to suffer out-of-pocket expenses because they wanted to right a wrong done to them and their neighbours.

9     TRC (for the respondents in the Appeals) and A&G (for the interveners) submitted that the decision of the High Court in *Tan Harry v Teo Chee Yeow Aloysius* [2004] 1 SLR 513 ("*Aloysius* (HC)") and the decision of this court in *Teo Chee Yeow Aloysius v Tan Harry* [2004] 3 SLR 588 ("*Aloysius* (CA)") (collectively referred to as "the *Aloysius* cases") underscored an established principle of law: if a court or tribunal makes a decision affecting two or more parties, against which only one party appeals but not the others, then if the appeal is successful, the parties with overlapping interests which fail to appeal are generally not entitled to the fruits of the successful party's appeal.

10    On the basis of these two cases, they submitted that it would be unfair to allow the non-appealing parties to enjoy the benefit of any costs orders arising from the Appeals. They emphasised that the non-appealing parties had not joined in the Appeals and had not accepted the risk of paying the costs of an unsuccessful appeal.

*Our views*

11    The question we have to answer is a very narrow one. Where a lower court or tribunal has made a decision against two or more parties with overlapping interests and the appeal succeeds on grounds earlier raised by parties who have chosen not to appeal, should the parties who have chosen not to appeal be also awarded their costs below by the appellate court?

12    In our view, the *Aloysius* cases do not stand for the general proposition contended for by TRC and A&G. Those cases involved two joint tortfeasors who had appealed against the quantum of damages awarded. Each of their appeals was confined to a single head of damages. The head of damages in question in each appeal was different. Each of the tortfeasors had sought to reduce the quantum of damages ordered to be paid not only by the amount reflecting the head of damages appealed against by that tortfeasor but also that appealed against by the other tortfeasor. The High Court's and this court's rejection of these imaginative attempts to minimise liability *does not* lend support to a wider principle that parties to the original proceedings who do not pursue an appeal *can never* reap the fruits, including the costs benefits, of a successful appeal. Quite different considerations come into the picture where the issue is damages not costs. In the circumstances of the *Aloysius* cases for instance, if each joint tortfeasor could have relied on a ground not raised by him to reduce the amount of compensation due to be paid, the successful plaintiffs could have been unfairly doubly deprived of compensation that had earlier been adjudged to be due to them (see *Aloysius* (HC) at [126]). The courts in the *Aloysius* cases also appeared to be concerned about the prejudice occasioned by the absence of proper notices of appeal in relation to substantive (as opposed to purely procedural) issues (*id* at [128]–[129] and *Aloysius* (CA) at [22]).

13    This court's power to order payment to a non-appealing party in the situation envisaged in [11] above may be found in O 59 r 4 of the Rules, which states:

> **Stage of proceedings at which costs to be dealt with (O.59, r.4)**
>
> 4.—(1)Costs may be dealt with by the Court at any stage of the proceedings or after the conclusion of the proceedings; and any costs ordered shall be paid forthwith notwithstanding that the proceedings have not been concluded, unless the Court otherwise orders.
>
> (2)    *In the case of an appeal the costs of the proceedings giving rise to the appeal, as well as the costs of the appeal and of the proceedings connected with it, may be dealt with by the Court hearing the appeal*; and in the case of any proceedings transferred or removed to the High Court from any other court, the costs of the whole proceedings, both before and after the transfer or removal, may be dealt with by the Court to which the proceedings are transferred or removed.
>
> [emphasis added]

This provision confers a generous power on the appellate court to deal with the costs of all the proceedings preceding an appeal.

14    Furthermore, O 57 r 13 of the Rules provides that:

> **General powers of Court (O.57, r.13)**
>
> 13.—(1)In relation to an appeal the Court of Appeal shall have *all the powers* and duties as to amendment and otherwise *of the High Court.*
>
> ...
>
>    (4)    ... notwithstanding that —
>
>        (a)    no notice of appeal has been given in respect of any particular part of the decision of the Court below or by any particular party to the proceedings in that Court ...

[emphasis added]

The power conferred on this court by the above would necessarily include the power to make such orders as to the costs as the High Court would be empowered to make.

15    In the present case, the Judge had left the issue of costs in the High Court proceedings at large. Further, as we have set aside the Horizon Board's order for the collective sale of Horizon Towers, made pursuant to its decision on 7 December 2007 (*Ng Eng Ghee* ([2]*supra*) at [212]), its costs orders also no longer have any force. Having had the benefit of perusing and evaluating the transcripts of the Horizon Board proceedings, this court is well-placed to make the requisite cost orders and there is therefore no need to remit the determination of costs back to the Horizon Board.

16    However, we should make it clear that there is no general rule that all parties to proceedings in a lower court will ordinarily be able to receive

their costs incurred in the lower court if that court's decision is ultimately overturned at the appellate level. It is trite that the mere existence of a power by no means requires its exercise in every case. There may well be cogent countervailing factors or considerations which weigh against such an outcome. All that need be said for now is that the court's power to order costs to be paid to parties who have chosen not to appeal must always be judicially exercised. Applications for such orders must also be made timeously to the appropriate appellate court.

17    In the present case, we agree with the submissions of the appellants in CA 120/2008 and the non-appealing parties set out at (b), (c), (d) and (f) in [8] above. Had the High Court or the Horizon Board come to the right decision in the first place, they would have been entitled to their costs. The fact that they did not appeal is not critical because other appellants were able to appeal and succeed before us on precisely the same issues. The fact that they had not accepted the "risk" of paying the costs of an unsuccessful appeal is neither here nor there. Also, there is nothing to suggest that the respondents have been prejudiced in any way. In this respect, it might be added that even if the non-appealing parties had been parties to the Appeals, the respondents would not necessarily have been entitled to more costs had they succeeded.

18    In the context of collective sales, these considerations apply with even greater force given the clear legislative recognition of the need to safeguard the interests of minority subsidiary proprietors in the course of collective sales (see, *eg*, the Second Reading of the Land Titles (Strata) (Amendment) Bill (*Singapore Parliamentary Debates, Official Report* (31 July 1998) vol 69 at col 601 (Assoc Prof Ho Peng Kee, Minister of State for Law)) and the Third Reading of the aforementioned Bill (*Singapore Parliamentary Debates, Official Report* (4 May 1999) vol 70 at col 1328 (Prof S Jayakumar, Minister for Law)). We are especially mindful that, given the significant costs (and not insignificant irrecoverable out-of-pocket expenses) incurred at every step of these bitterly fought, convoluted and labyrinthine proceedings, it was not unreasonable for some of the objecting subsidiary proprietors to forgo their appellate participation before this court. We cannot lose sight of the fact that the non-appealing parties have (together with the appellants) been literally driven from pillar to post in their arduous efforts to protect their homes. In their submissions to this court, they have cogently explained why they should be entitled to the costs they have incurred in these proceedings:

> [W]e were made to defend our homes against an en bloc process actuated by a lack of good faith. We have sacrificed time, effort and money, not for any gain but to maintain the *status quo*, that is, to keep our homes.

19    For these reasons, we are of the view that the non-appealing parties are entitled to recover costs for the Horizon Board proceedings (but only

the Second Tranche for the reasons set out at [29]–[30] below) and the High Court proceedings. In arriving at our decision, we have not placed any particular reliance on our finding that there was a lack of good faith in the *en bloc* sale. We have already noted that costs are generally compensatory and not punitive (see [1] and [7] above). Although the conduct of the paying party in the *proceedings* may have an impact on costs orders (especially where the paying party unnecessarily complicates or prolongs proceedings, or otherwise acts in a manner amounting to abuse of court processes), the lack of good faith in the *transaction* does not always call for exceptional treatment. It bears emphasis that our finding in relation to the lack of good faith centred on the behaviour of certain individuals who are not parties to these proceedings. All said and considered, it would be quite unfair to attribute their lack of good faith and/or diligence to the respondents for the purposes of assessing costs, thereby increasing their costs burden substantially.

### Entitlement of appellants to one set of costs each

#### The parties' submissions

20    HEP (for the appellants in CA 119/2008) and the appellants in CA 120/2008 submitted that they should each be awarded one set of costs because, *inter alia*, each set of appellants had the right to appoint their own counsel, whether based on their view of the counsel's ability or the level of trust they placed in their respective counsel. This was especially since, at the time of lodging objections to the application to the Horizon Board, each set of appellants was not well-acquainted with the other minority owners who had lodged objections. Thus, they had no choice but to obtain their own representation and conduct their own cases. Furthermore, the appellants' arguments were not identical. While the arguments could be broadly grouped under certain categories (*eg*, bad faith), the precise points relied on by each set of appellants were not the same. Finally, the *en bloc* sale had been tainted by bad faith from the start.

21    TRC (for the respondents in the Appeals) and A&G (for the interveners) submitted that the court had the discretion to award only one set of costs even where the parties were separately represented. The case of *Harbin v Masterman* [1896] 1 Ch 351 was cited as authority for the proposition that separate sets of costs would only be awarded to successful defendants who were separately represented if the court was satisfied that such separate representation was justified.

#### Our views

22    We accept that the right to be represented by separate counsel does not invariably carry with it an entitlement to recover all the attendant legal costs incurred. This right must be judiciously balanced against the desirability of not unduly penalising the losing party by visiting it with

unreasonably incurred costs. As sagely noted by Sir Richard Malins VC in *Smith v Buller* (1875) LR 19 Eq 473 (at 475):

> It is of great importance to litigants who are unsuccessful that *they should not be oppressed by having to pay an excessive amount of costs.* ... I adhere to the rule which has already been laid down, that *the costs chargeable under a taxation as between party and party are all that are necessary to enable the adverse party to conduct the litigation, and no more. Any charges merely for conducting litigation more conveniently may be called luxuries, and must be paid by the party incurring them.* [emphasis added]

To this, we would add the qualification that these observations should now be read in the context of our present costs regime that allows recovery of all costs *reasonably* rather then just *necessarily* incurred.

23     The court's reasoning in *Harbin v Masterman* ([21] *supra*) neatly demonstrates how these opposing considerations may be evaluated. In that case, an annuitant had brought an appeal against the order of the judge at first instance, which directed the annuitant to pay over certain funds to certain charities being residuary legatees although her annuity was still charged upon the residuary estate. In the appeal, the five residuary legatees were represented by four different sets of counsel. The appeal was dismissed. On the issue of costs, it was submitted for the respondents that each respondent was entitled to appear and defend itself by the counsel whom it chose to instruct and neither the court nor the appellant could question it for doing so (*id* at 363.) To this contention, Lindley LJ gave the following response with his customary clarity (*id* at 364):

> In these cases there is always a discretion in the Court of Appeal as to the orders it ought to make with reference to the question of costs; and the Court is bound to see that its orders are not necessarily oppressive. *It appears to me that in this case there really was no sensible reason for all parties appearing by separate solicitors. It is well known that only two counsel in the same interest can be heard here. I think it would be oppressive to allow more than one set of costs.* What we are prepared to do is to exercise our discretion on this occasion, and give the costs to the party who has the conduct of the cause. There will be one set of costs to be paid by the appellant, and the others must pay their own costs. *They are perfectly justified in employing their own solicitors if they like; but this is not a case where it was necessary for four sets of counsel to be instructed in order to protect the rights of the residuary legatees.* [emphasis added]

24     It is axiomatic that counsel, as officers of the court, ought not to unnecessarily consume judicial time (or, for that matter, the time of quasi-judicial or administrative tribunals) by repetitively covering the same ground. Each determination of whether to award more than one set of costs will necessarily have to turn on the facts of the case. The court ought to take into consideration all relevant factors, including: (a) the degree of the

community of interests existing among the parties; (b) the size of the sum or the importance of the interest that is the subject matter of the dispute; and (c) the degree of overlap in the pre-hearing preparations and conduct of proceedings. *In general*, the greater the community of interests, the less inclined the court will be to grant separate costs for separate representation. *On the other hand*, the more important and distinct the interests which are the subject of the dispute, the more likely would an order for more than one set of costs be given. An order for more than one set of costs is also more likely where counsel have taken efforts to avoid the duplication of effort. Plainly, where there is an obvious community of interests between multiple parties on the same side, their counsel should try and agree, as far as possible, on the best approach towards advancing a unified case for their clients. That said, the court will also bear in mind the need to not unduly deter persons from making reasonable efforts to protect or vindicate their rights (see [1] above). Finally, for completeness, it should be noted that as this court recently indicated in *Wing Joo Loong Ginseng Hong (Singapore) Co Pte Ltd v Qinghai Xinyuan Foreign Trade Co Ltd* [2009] 2 SLR 814 (at [201]–[202]), the usual order where different parties with broadly similar interests are represented by different counsel is just one set of costs.

25    The factual matrix of *Harbin v Masterman* ([21] *supra*) differs markedly from that of the present appeals (*ie*, the Appeals). First, in *Harbin v Masterman*, the starting point was that the two co-defendants had a *joint* defence and the court had to decide whether the defence was rightfully severed such that separate sets of costs should be ordered. In the present appeals (*ie*, the Appeals), the starting point is that the two sets of appellants filed separate appeals in respect of separate originating summonses; we now have to determine whether only one set of costs should be awarded in respect of the successful appeals. Admittedly, this consideration alone should not affect the mechanics of the court's decision, as in both cases, the court has to evaluate the justifiability of separate costs, having regard to the prevailing factors such as those set out in [24] above. Pertinently, the court's decision in *Harbin v Masterman* appeared to be constrained by a procedural rule that only two counsel could be heard in the same interest in the court (*viz*, the Chancery Division); in Singapore there is no equivalent rule. That said, as a general rule, parties advancing or supporting the same cause should ordinarily not be entitled to receive separate sets of costs for repeating or reiterating points or matters.

26    In the present appeals (*ie*, the Appeals), it was not unreasonable for the appellants to engage separate counsel, given the importance of the subject matter at stake, *viz*, their homes, and the involved nature of the dispute. Given the emotional and sentimental attachment that people tend to form to their homes, it was quite understandable that each set of appellants chose counsel they trusted to personally manage their case, rather than simply casting their lot together with all of the other objecting

subsidiary proprietors. The appellants have quite reasonably explained that they had indeed aligned themselves with other subsidiary proprietors they were familiar with and on that basis had attempted to engage common counsel where feasible. This assertion was not strenuously challenged by either the respondents or the intervener. In the circumstances, the *key consideration* for us in this matter would be whether there was an unnecessary duplication of work and/or wastage of time as a result of the appellants' separate representation.

27     Although both sets of appellants raised the issue of good faith, they had from the outset differentiated themselves in their cross-examination of witnesses and in the approaches adopted in their submissions. In particular, a not insignificant number of points we developed in *Ng Eng Ghee* ([2] *supra*) had their seeds in the cross-examination of Mr Ramesh Kannan from TKQ in the course of the Second Tranche of the Horizon Board proceedings. Not all of these points had been raised or followed up by counsel for the other objecting subsidiary proprietors. Mr Rudy Darmawan's submissions before us (for the appellants in CA 120/2008) on the conflict of interest on the part of First Tree Properties Ltd and the members of the original sale committee who bought additional units in Horizon Towers (*id* at [188]–[192]) and the original sale committee's decision at the 6 January 2007 sale committee meeting to proceed with the sale of Horizon Towers despite the erosion of the original sale committee's estimated 80% premium (*id* at [193]–[195]), which were founded on the face of the facts, were also helpful and persuasive. They were quite distinct from the submissions made by HEP which were quite narrowly centred on the lack of proper disclosure and follow-up in relation to the offer from Vineyard Holdings (HK) Ltd ("Vineyard") to purchase Horizon Towers ("the Vineyard offer") (*id* at [178]–[180]).

28     There was, of course, some degree of duplication of legal resources in this matter, though our perusal of the relevant records does not indicate that it was unreasonable. The separate representation was therefore neither oppressive nor embarrassing. Thus, in our view, the appellants in CA 119/2008 and CA 120/2008 are entitled to separate sets of costs for the Horizon Board proceedings (but only the Second Tranche for the reasons set out at [29]–[30] below), the High Court proceedings and the present appeals (*ie*, the Appeals) with an appropriate diminution of the quantum being given to take into account duplication of work, legal relevance and the cogency of the contentions advanced. After considering, *inter alia*, the record of the entire proceedings, the contentions made by the appellants and the non-appealing parties, and for the reasons given in this judgment, we are of the view that the appellants in CA 119/2008 represented by HEP ought to receive only 60% of their costs here and below. The appellants in CA 120/2008 are entitled to 80% of their costs incurred here and below. The non-appealing parties' stance was broadly similar to the appellants in

CA 120/2008 and they are also entitled to recover 80% of their costs for the High Court proceedings and likewise the Horizon Board proceedings. Since the appellants in CA 120/2008 and the non-appealing parties were both represented by TKQ in the Horizon Board proceedings, the costs of those proceedings when recovered are to be shared equally between the appellants in CA 120/2008 and the non-appealing parties.

**The costs that are recoverable**

*Costs for the First Tranche and OS 1269/2007*

29    At the end of the First Tranche of the Horizon Board Proceedings, the Horizon Board dismissed the application for a collective sale on the technical basis that three pages comprising the execution pages of three consenting subsidiary proprietors were not attached to the collective sale agreement in question ("the CSA") filed as part of the application. As to the issue of costs, no order was made on the basis that the defect leading to the dismissal had not been the subject of the objections filed by the objecting subsidiary proprietors. In OS 1269/2007, the High Court allowed the majority owners' appeal against the Horizon Board's decision and remitted the matter back to the Horizon Board, leaving the issue of costs to be heard at a later date.

30    It is apposite to note that s 84A(7C) of the Land Titles (Strata) Act (Cap 158, 1999 Rev Ed) now deals specifically with situations of technical non-compliance with the procedural requirements of an application for a collective sale. Statutory sanction to overlook such defects has now been made express. However, the provision only came into effect after the First Tranche. In these circumstances, it is fair that no order for costs for the First Tranche and OS 1269/2007 be made.

*Standard or indemnity basis*

31    The appellants submitted that costs should be ordered against the respondents on an indemnity basis, because, *inter alia*, the respondents had suppressed information relating to the Vineyard offer (essentially by failing to produce Vineyard's written offer of $510m for Horizon Towers during discovery) (see, *inter alia*, *Ng Eng Ghee* ([2] *supra*) at [77]–[78]), and because the respondents had conducted the Horizon Board proceedings in an unjustifiably adversarial manner by, *inter alia*, asserting legal privilege over the advice given by the original sale committee's solicitors (*id* at [8] and [55]).

32    Although different aspects of the respondents' conduct certainly merited varying degrees of criticism, we are of the view that the matters alleged by the appellants did not compel a departure from the usual basis of costs (see, *eg*, *Heng Holdings SEA (Pte) Ltd v Tomongo Shipping Co Ltd*

*(No 2)* [1997] 3 SLR 919 where the Court of Appeal ordered costs to be on a standard basis even though there was a material non-disclosure of facts).

### Reasonable costs incurred by in-person litigants

33      The respondents submitted that the appellants in CA 120/2008, who were represented in person, should be entitled to their disbursements only. Given that we have decided that the non-appealing parties (*ie*, Then Khek Koon and Tan Kim Lian Jasmine) should be awarded costs, it is also necessary to determine whether the award for the High Court proceedings (in which the non-appealing parties appeared in person) should be limited to their disbursements.

34      The ordinary entitlement of a successful litigant-in-person to costs has now been clarified by O 59 r 18A of the Rules, which indicates that successful litigants-in-person would generally be awarded "such costs as would reasonably compensate the litigant for the time expended by him, together with all expenses reasonably incurred". The respondents and the intervener have not made out a persuasive case as to why the usual costs orders for a successful litigant-in-person should not be made. We also note that there has been no suggestion from either the respondents or the intervener that the non-appealing parties had conducted their case inappropriately. Accordingly, the appellants in CA 120/2008 are entitled to such costs of the appeal (*ie*, CA 120/2008) and the High Court proceedings as would reasonably compensate them for the time expended by them, together with all expenses reasonably incurred. The same entitlement applies to the non-appealing parties in respect of the High Court proceedings.

### Costs for three counsel

35      Counsel for the appellants in CA 119/2008, HEP, submitted that they should be entitled to a certificate of costs for three counsel pursuant to O 59 r 19 of the Rules because of the lengthy and complicated nature of the Horizon Board proceedings and the High Court proceedings, as well as the lengthy submissions and large number of authorities raised.

36      In the light of O 59 r 19(1) of the Rules, certification is now only required where the costs of more than two solicitors (or counsel as the case maybe) are sought. Nevertheless, the use of more than two solicitors must be reasonable, having regard to para 1 of Appendix 1 to O 59. In our view, the appellants in CA 119/2008 are entitled to the costs of only two counsel for CA 119/2008, the Horizon Board proceedings and the High Court proceedings, because, as mentioned at [27] above, TKQ and Mr Darmawan had in fact helped to develop many of the issues on good faith that, in the final analysis, took centre stage in these proceedings. The appellants in CA 119/2008 are not entitled to the costs incurred in relation to the canvassing of the administrative and constitutional law points in the earlier

proceedings as all these points have been found to be without merit by the High Court. It bears mention that these particular points were not pursued in this court.

### Liability for costs

37    The intervener claims that its participation in the proceedings was all along "secondary" to that of the respondents. The record of proceedings indicates otherwise. It is clear from the transcripts of the High Court proceedings that the intervener took the lead in defending the Horizon Board's decision to make an order for the collective sale. Indeed, although the intervener was not allowed to appear in the Horizon Board proceedings, it was quite apparent that the intervener was directly or indirectly influencing the majority owners in the conduct of those proceedings. Furthermore, it can be fairly said that the intervener by its conduct engendered the continuation of the dispute in the Second Tranche, the High Court proceedings and the present appeals (*ie*, the Appeals). It had, *inter alia*, filed proceedings against the majority owners in Originating Summons No 1238 of 2007 in respect of an alleged failure to fulfil their contractual obligation to obtain a collective sale order. Indeed, TRC now unequivocally asserts that:

> [C]ompliance with the Interveners [*sic*] demands is however the single key factor for the prolongation of the entire hearings, and the concomitant costs incurred by all parties in the process.

38    On the other hand, we note that the respondents could well have simply stood their ground and insisted that the collective sale had been aborted instead of meekly acquiescing to the intervener's attempt to prevail on them through legal means (see *Ng Eng Ghee* ([2] *supra*) at [47]). They cannot be permitted to shirk all responsibility for their role in this matter and especially the conduct of the proceedings below.

39    On the balance, we are of the view that fairness dictates that the costs ordered against the respondents for the High Court proceedings and the Appeals should be borne equally by the interveners and the respondents. The costs of the Second Tranche of the Horizon Board Proceedings are to be borne by the respondents alone.

### Interest on the deposit

40    Our attention has also been drawn to another contentious issue which only surfaced after we delivered our judgment on 2 April 2009. A substantial amount of interest has accumulated on the deposit paid for the purchase of Horizon Towers. As at 6 May 2009, the amount was $1,883,087.40. In a letter to the consenting subsidiary proprietors dated 24 April 2009, the present sale committee stated it had taken legal advice from its conveyancing solicitors on the appropriate apportionment of the interest. The advice, as set out in the aforementioned letter, reads as follows:

We have reviewed the terms of the Collective Sale Agreements (CSA) and in particular clause 17 entitled Division of Sale Proceeds. In our view clause 17 governs the distribution of the sale proceeds where all owners are consenting subsidiary proprietors (CSP) or where an Order has been obtained from the Strata Titles Board (STB) approving the sale. Under the present circumstances Clause 17 cannot apply and the interest should be distributed according to the general principles which have governed this collective sale. They are:

> 1.    The sale and purchase agreement (S&P) was made between the CSPs and the Purchaser and the rights to the interest under the terms of the S&P would belong to the CSPs only. In this respect CSPs would mean all owners who have executed the CSA or the letter of ratification binding themselves to the terms of the S&P;
>
> 2.    *Non CSPs have no rights to enforce any of the terms of the CSA and accordingly shall have no rights to the interest under the terms of the S&P;*
>
> 3.    The distribution of the interest would be given to the CSPs proportionately in accordance with the formula set out in clause 17.1(a). However if the Sale committee [*sic*] agrees, this formula has to be adjusted (in terms of share value area) such that only the units of the CSPs are aggregated and applied to the formula.
>
> 4.    All disbursements accrued on an individual unit basis, for example CPF solicitors' aborted legal costs should first be aggregated and deducted from the interest before distribution to the CSPs. The reason is that as the collective sale was unsuccessful, these disbursements and costs were incurred as part of the expenses in trying to achieve the objective of a successful sale. For example, when the order of the STB [*ie*, Strata Titles Board] was obtained on 17th December 2007, title searches were conducted and redemption documents (where relevant) were prepared for ALL units including those owned by the minority and objecting owners.

...

[emphasis added]

41    We wish to express our disappointment that the respondents' conveyancing solicitors (who are not the same as counsel representing them in the Appeals) have failed to appreciate the clear thrust of our substantive decision as elaborated on in *Ng Eng Ghee* ([2] *supra*). Their advice has plainly failed to appreciate that the purchase consideration was paid by the intervener for *all* the units in Horizon Towers and not merely those owned by the consenting subsidiary proprietors. In a collective sale, the minority objecting proprietors have no choice in the sale of their flats, if all the requisite statutory conditions are met. Pending the completion of the sale, the sale committee will hold the purchase consideration (and the accrued

interest) as the agent for *all* of the subsidiary proprietors. If completion is effected, the interest will be equitably distributed to all of them in accordance with the approved contractual arrangements. Whether or not the dissenting proprietors (or those who are not parties to the sale and purchase agreement) are entitled to enforce the agreement is irrelevant, because part of the purchase consideration was paid for *their* units. The conveyancing solicitors have confused beneficial rights with contractual rights. The setting aside of the sale to the respondents is also quite irrelevant, as the right to the interest is an accrued right, and not dependent on the actual performance of the sale and purchase agreement. The consenting subsidiary proprietors cannot be allowed to appropriate for themselves that portion of the interest held for the benefit of the objecting subsidiary proprietors.

42     Thus, the interest is to be shared by all the subsidiary proprietors. The present sale committee is not entitled to decide that only the consenting subsidiary proprietors are entitled to the interest. Each subsidiary proprietor's entitlement is to be calculated based on the share value and strata area of each unit in equal weightage as illustrated in cl 17.1(a) of the CSA (*ie*, on the same basis as the apportionment of the sale proceeds if a successful sale had taken place). It is entirely up to each individual objecting subsidiary proprietor to decide how he wants to deal with the proportionate amount of the interest due to him.

**Our costs orders**

43     To conclude, our costs orders are as follows:

    (a)    No order as to the costs for the First Tranche of the Horizon Board Proceedings and OS 1269/2007.

    (b)    The appellants in CA 119/2008 (represented by HEP) are entitled to, *firstly*, one set of costs for the Second Tranche of the Horizon Board proceedings, to be taxed for two counsel and borne in full by the respondents; and, *secondly*, one set of costs for the High Court proceedings and one set of costs for CA 119/2008, each to be taxed on the basis of two counsel and borne equally by the respondents and the intervener. The appellants in CA 119/2008 are not entitled to recover any costs *apropos* the administrative and constitutional law arguments raised in the Horizon Board proceedings and the High Court proceedings. They are limited to recovering only 60% of the assessed costs of the aforementioned proceedings (see [28] above).

    (c)    The appellants in CA 120/2008 are entitled to, *firstly*, one set of costs for the Second Tranche of the Horizon Board proceedings, to be taxed on the basis of two counsel and borne fully by the respondents; and, *secondly*, one set of costs for the High Court proceedings and one

set of reasonable compensatory costs for CA 120/2008, each pursuant to O 59 r 18A of the Rules and to be borne equally by the respondents and the intervener. They are limited to recovering only 80% of the assessed costs of the aforementioned proceedings (see [28] above), and the costs of the Second Tranche of the Horizon Board proceedings are to be shared equally with the non-appealing parties (see [28] above and (d) below).

(d)    The non-appealing parties (*ie*, Then Khek Koon and Tan Kim Lian Jasmine) are entitled to, *firstly*, one set of costs for the Second Tranche of the Horizon Board proceedings, to be taxed on the basis of two counsel and borne fully by the respondents; and, *secondly*, one set of reasonable compensatory costs for the High Court proceedings pursuant to O 59 r 18A, to be borne equally by the respondents and the intervener. They are also limited to recovering only 80% of the assessed costs of the aforementioned proceedings (see [28] above), and the costs of the Second Tranche of the Horizon Board proceedings are to be shared equally with the appellants in CA 120/2008 (see [28] above and (c) above).

(e)    The interest on the deposit money is to be shared by all the subsidiary proprietors and each subsidiary proprietor's entitlement is to be calculated, based on the share value and strata area of each unit in equal weightage, as illustrated in cl 17.1(a) of the CSA. It is for each individual objecting subsidiary proprietor to decide how he wants to deal with the amount paid over to him.

Reported by Pao Pei Yu Peggy.

# EXHIBIT D-4

# SINGAPORE COURT PRACTICE
# 2006

*General Editor*

## Jeffrey Pinsler

LLD (Liverpool), LLM (Cambridge), LLB (Hons) (Liverpool),
FSIArb, Regional Panel Arbitrator (SIAC),
Principal Mediator (SMC), Advocate and Solicitor (Singapore),
Barrister (Middle Temple),
Professor of Law (National University of Singapore)

**LexisNexis**
Singapore • Malaysia • Hong Kong
2006

Court otherwise directs, be entitled to his costs of the counterclaim incurred to the time of receipt of the notice of acceptance by the plaintiff of the money paid into Court.

(9)     Where any person claiming to be a creditor comes in to prove his title, debt or claim in relation to a company in pursuance of any such notice as is mentioned in Order 88, Rule 10, he shall, if his claim succeeds, be entitled to his costs incurred in establishing it, unless the Court otherwise directs, and, if his claim or any part thereof fails, may be ordered to pay the costs of any person incurred in opposing it.

(10)     Where a claimant is entitled to costs under paragraph (9), the amount of the costs shall be fixed by the Court unless it thinks fit to direct taxation and the amount fixed or allowed shall be added to the claimant's debt.

---

**59/3/1. Entitlement to costs.** It is a general rule that a party is not entitled to recover costs unless he has obtained an order of court which makes such provision. (See O 59 r 3(1); *Malaysian International Merchant Bankers v Chi Liung Holdings* [1992] 1 MLJ 735.) There are qualifications to this principle in the rules (including provisions in O 59 rr 3 and 10).

**59/3/2. Discretion to award costs.** An order for costs is a matter of discretion which is to be exercised as the court 'sees fit' (O 59 r 3(2)). 'The power to award costs is fundamentally and essentially a discretionary power. Even though the general principle is for the substantially successful party to receive his costs, the overriding concern of the court must be to exercise its discretion to achieve the fairest allocation of costs.' (*Soon Peng Yam & Chan Ah Kow v Maimon bte Ahmad* [1996] 2 SLR 609, at 619. Also see *Lipkin Gorman v Karpnale* [1989] 1 WLR 1340, at 1389–1390.) For a case which illustrates the scope of this discretion in relation to multi-party actions involving planning appeals, see *Bolton Metropolitan District Council v Secretary of State for the Environment* [1996] 1 All ER 184.

In *Tullio v Maoro* [1994] 2 SLR 489, the Singapore Court of Appeal adopted the English Court of Appeal's statement of principles governing the discretion to award costs in *Re Elgindata (No 2)* [1993] 1 All ER 232, at 237:

> The principles are these. (1) Costs are in the discretion of the court. (2) They should follow the event, except when it appears to the court that in the circumstances of the case some other order should be made. (3) The general rule does not cease to apply simply because the successful party raises issues or makes allegations on which he fails, but where that has caused a significant increase in the length or cost of the proceedings he may be deprived of the whole or part of his costs. (4) Where the successful party raises issues or makes allegations improperly or unreasonably, the court may not only deprive him of his costs but order him to pay the whole or part of the unsuccessful party's costs. Of these principles, the first, second and fourth are expressly recognised or provided for by rr 2(4), 3(3) and 10 respectively. The third depends on well-established practice. Moreover, the fourth implies that a successful party who neither improperly nor unreasonably raises issues or makes allegations on which he fails ought not to be ordered to pay any part of the unsuccessful party's costs.

The principles established in *Re Elgindata (No 2)* and *Tullio v Maoro* concerning the court's discretion to award costs were applied in *MCST No 473 v De Beers Jewellery* [2002] 2 SLR 1. Also see *Jet Holding v Cooper Cameron (Singapore)* [2006] SGHC 20 (which is addressed at para 59/6A/2).

The court may not apply the general rule that costs follow the event where the successful party has raised numerous inappropriate claims which caused delay and expense (*Bank Nationale de Paris v Tan, Nancy* [2002] 1 SLR 29 (supplementary judgment, paras 2–4)).

In *Progress Software Corp (S) v Central Provident Fund Board* [2003] 2 SLR 156, para 50, the Court of Appeal emphasised that the principle that 'costs follow the event' 'does not cease to apply simply because the successful party did not succeed on every issue or allegation' in the court below (applying *Tullio v Maoro* [1994] 2 SLR 489). The Court of Appeal upheld the High Court's decision to award costs to the respondents even though they succeeded on one of three issues (ibid, para 51). Also see *Alagappa Subramaniam v Chidambaram s/o Alagappa* [2003] SGCA 20, para 92 and *MCST No 473 v De Beers Jewellery* [2002] 2 SLR 1.

The general principle that the successful party is entitled to his costs applies even though costs have been 'thrown away' by the unsuccessful party in the latter's preparation for the cross-examination of witnesses as a result of the successful party's election not to adduce evidence. However, the successful party may be liable for part of the hearing fees if he could have reasonably informed the unsuccessful party in advance thereby saving the latter from incurring the costs

# EXHIBIT D-5

Case3:05-cv-00646-EMC   Document209-2   Filed12/14/09   Page27 of 67

## Sumitomo Bank Ltd v Kartika Ratna Thahir

**A**

HIGH COURT — ORIGINATING SUMMONS NO 308 OF 1976
LAI KEW CHAI J
30 SEPTEMBER 1996

**B**

*Civil Procedure — Bill of costs — Taxation — Application to review taxation of costs — Whether sums awarded fair and reasonable*

### Facts

This was an application to review the taxation for a bill of costs which arose out of the case reported in [1993] 1 SLR 735, a trial which involved many days of hearing and a protracted period of adjournment. The parties to the proceedings were dissatisfied with the deputy registrar's decision on the taxation of costs and had asked for a review of his decision, which did not result in any adjustment of his awards. The parties subsequently filed summonses in chambers to a judge for review of the taxation.

**C**

**D**

**Held**, dismissing the application:

(1) An application for review of taxation had to be made within 14 days of the date of the deputy registrar's decision.

(2) The process of assessment of party and party costs was not a matter of mathematical multiplication, with assumed multiplier and multiplicand, nor were time sheets conclusive of the total amount of time which reasonably would have been spent on any particular aspect of getting-up. They were, however, valuable as guides in assisting in the process of assessment (see ¶ 17).

**E**

(3) It was acknowledged that the lawyers in this trial had to do extensive work and contend with very poor documentation due to the poor state of administration of the plaintiffs during the relevant period. Much of the additional and urgent work done, however, was caused by factors for which the first defendant could not reasonably be made to pay (see ¶ 18).

**F**

### Case(s) referred to

*Jeyaretnam Joshua Benjamin v Lee Kuan Yew* [1993] 1 SLR 185 (refd)
*Simpson's Motor Sales (London) Ltd v Hendon Corp* [1964] 3 All ER 833 (folld)

**G**

### Legislation referred to

Rules of the Supreme Court O 59 rr 27(2), (3), 35(3), 36(2), (5)

**H**

### Lawyers

*Wong Meng Meng* and *Sim Bock Eng (Wong Partnership)* for the plaintiffs.
*Michael Hwang, K Shanmugam* and *Francis Xavier (Allen & Gledhill)* for the first defendant.
*Harry Wee (Braddell Brothers)* for the second defendants.

**I**

*Cur Adv Vult*

**A**  **Lai Kew Chai J**:  All three parties to these proceedings (hereinafter referred to as Pertamina, Kartika and the estate respectively) applied under O 59 r 36(1) Rules of the Supreme Court by summons to the High Court to review the taxation of getting up and certain other items in Bill of Costs No 1601 of 1994 by the deputy registrar, Mr Ng Peng Hong. In such a review of the deputy registrar's certificate the High Court 'may make such order as the circumstances require, and in particular may order the registrar's certificate to be amended or, except where the dispute as to the item under review is as to amount only, order the item to be remitted to the registrar for taxation' (O 59 r 36(5)).

**B**

2    Just to have an overview it may be recited that the total party and party costs claimed by Pertamina was $7,381,748.27 and the amount allowed by the deputy registrar was $2,671,294.33. The breakdown of the amount allowed by the deputy registrar is as follows: (a) Section 1 (work done for the cause) the sum of $1,750,700; (b) Section 2 (work done for the taxation of costs) the sum of $6,000.00; (c) Section 3 (disbursements made in the cause) the sum of 913,339.26; and (d) Section 4 (disbursements made in the taxation of costs) the sum of $1,255.07.

**C**

**D**

3    On 24 April 95 the deputy registrar delivered his judgment on the taxation of the costs. All the parties were dissatisfied with the decision and asked for a review of his decision on his award for the work done for the cause and several items of disbursements incurred for the cause and for the taxation of the costs. On 19 June 1995 the deputy registrar took another look at his decision. He remained of the views and did not adjust any of his awards, except for a very minor item. He increased the disbursements incurred in respect of a witness, Zacharia Brori's expenses, by $574.00. On 24 July 1995 the deputy registrar delivered his grounds of decision.

**E**

4    Any party to the proceedings before the deputy registrar could after the review request the deputy registrar to state in his certificate or otherwise in writing the reasons for his decision of the review, and any special facts or circumstances relevant to it (O 59 r 35(3)). Under the paragraph immediately following the rules it was provided that '(a) request under para 3 must be made within 14 days after the review or such other period as may be fixed by the registrar.' On 20 June 1995 Kartika made the request. She was followed on the following day by the estate and by Pertamina. On 21 June and 30 June 1995, she and the estate respectively filed summonses in chambers to a judge to review the taxation.

**F**

**G**

5    As mentioned earlier, the deputy registrar delivered his grounds of decision on 24 July 1995. Notes of evidence and arguments were also made available. On 5 August 1995 Pertamina filed a summons in chambers for review of the deputy registrar's decision. Under O 59 r 36(2), an application for review 'may be made at any time within 14 days, or such longer period as the registrar at the time when he signs the certificate or the court at any time may allow.' If the period of 14 days ran from the date of the decision of the deputy registrar, ie on 19 June 1995, then Pertamina was out of time. If it ran from 24 July 1995, the date when the deputy registrar delivered his grounds of decision, then Pertamina would have been in time. Predictably, Kartika filed a summons in chambers to strike out Pertamina's application on the ground that it was filed out of time. On the other hand, Kartika

**H**

**I**

A

and the estate would have prematurely filed their summonses in chambers to a judge to review the taxation if the period of 14 days ran from the delivery of the grounds of decision on 24 July 1995. Again predictably, Pertamina filed a summons in chambers to strike out Kartika's and the estate's application to a judge in chambers to review the taxation on the ground that they were filed ahead of time. Precaution was taken by Pertamina as they asked, alternatively, for an extension of time. After hearing arguments, I ruled that Pertamina's application to a judge for review of the taxation was out of time. As the views taken by the advisers of Pertamina on the interpretation of O 59 r 36(2), though erroneous, could conceivably and reasonably be taken, I allowed Pertamina an extension of time but I ordered Pertamina to pay Kartika costs of all the relevant applications at $5,000 and the estate the sum of $1,500 as costs. Order 59 r 36(2) of the present Rules of Court now provides clearly that the application for review by a judge may be made 'at any time within 14 days of the review by the Registrar ...'

B

C

6    The bill of costs was taxed substantially on the standard basis, except in respect of certain disbursements of Pertamina's witnesses and applications under s 32 of the Evidence Act which were taxed on the indemnity basis. The bill of costs arose out of the case reported in [1993] 1 SLR 735. A high ranking officer and fiduciary of Pertamina took bribes which were traceably deposited with a bank (the bank) in the joint names of himself and Kartika, a volunteer. The officer died and left behind in the bank 17 DM ACU accounts, which were proved to be bribes, and 2 US dollar ACU accounts, which were not proved to be bribes. Faced with competing claims between the estate of the officer and Kartika, the bank interpleaded. Pertamina was joined as a party far back on 24 June 1977. As far back as March 1980 interpleader issues were ordered to be tried. The learned deputy registrar set out correctly the complex issues of fact and law.

D

E

7    The trial started in August 1991 but it had to be adjourned after about five days of hearing. I have to say that notwithstanding its remarkably protracted period of gestation, since 15 years had elapsed after Pertamina became a party to the proceedings, the action was by no means ready for an orderly, systematic and speedy trial. Even though the trial was at its opening stages, there were questions in my mind whether the proofs of evidence were in fact sufficiently garnered. At the same time, the question also arose whether the issues of law, such as the soundness and reception of *Lister v Stubbs*, which was at the heart of the case, and the applicable law would be exhaustively canvassed. A comparison between the list of issues mentioned, the bundles of documents and the list of authorities cited at the first hearing and those presented at the resumed hearing five months later, which were far more organised and incisive, would reveal the relative state of preparedness. The resumed hearing went on for 43 days.

F

G

H

7.1  It took that long because much of the oral evidence on the side of Pertamina was not preserved, as it should have been as early as 1977. More remarkably the relevant documents in connection with the transactions in which bribery had taken place were also not kept under lock and key. In consequence, documentary evidence of payments by Pertamina to the two foreign contractors, who had bribed the fiduciary, had to be procured in some cases from other sources or retrieved from a warehouse. For instance, it was remarkable that the bank's documents evidencing the first deposits or payments made by the fiduciary in each of the

I

A    many individual accounts, which were an essential chain in the documentary trail, were not subjected to the discovery process until practically the trial.

7.2 Kartika, who was short on merits, predictably became long on technicalities. She put Pertamina to strict proof, as she was entitled to. As matters stood at the commencement of the trial, she was the owner of the money in law. It was up to

B    Pertamina to prove, as against Kartika the volunteer, ownership in equity of the money in the accounts or choses in action, inclusive of the substantial interest, or recovery for money had and received but through and by the route of common law tracing: ie to show that Pertamina's money payments to their foreign contractors were identifiably the same as those standing in the several accounts of the fiduciary in the bank. Because of breaks in Pertamina's documentation it even

C    became an issue whether Pertamina had the title to sue; there were suggestions that a company of Pertamina, PT Krakatua, might have been the developer of the projects in question. It would be fair to say that those representing Pertamina, at various levels in the team of litigators, were put through hoops of steel throughout the trial. Learned counsel for Kartika was throughout unyielding; and there was no agreement to an agreed bundle as to authenticity.

D

8    At the conclusion of the trial, Pertamina succeeded in their proprietary claims to the 17 DM ACU deposits, by way of constructive trusts and by tracing at law, but not the two US dollar ACU accounts. I awarded Pertamina the costs of the proceedings and issued a certificate of two counsels.

E    *The decision of the deputy registrar*

9    The deputy registrar had in mind the principles relating to taxation on a standard or indemnity basis. He stated that he would apply O 59 r 27(2) and (3). He further stated that he also 'took into account all the relevant circumstances of the case and, in particular, the factors listed in App 1 of O 59 RSC'. He was fully

F    aware that the case was 'one of great complication and great difficulty'. It involved a lot of work and the responsibility was 'heavy'. A lot of skill and specialised knowledge were required of counsel. He was aware of the extensive discovery and the voluminous documents which he must have perused with some care in view of the findings he made later in his grounds of decision. He recognised that the amount at stake was substantial and the importance of the case

G    to the parties.

10    The learned deputy registrar agreed that from 1977 to late 1979 nothing significant in the proceedings to advance the case took place. It is to be noted that the bulk of the costs incurred by Pertamina from 1980 to early 1984 had been taxed and paid for by Kartika. It amounted to a sum of $198,992.20. Obviously,

H    there can be no question of duplicating these costs against Kartika. Between 1984 and 1989, pleadings were amended and there was discovery, though it was not exhaustive.

11    Under section 1 of the bill, Pertamina claimed a total of $2,307,776.26 as the getting up fees of David Hunt QC ($1,090,733.50) and Michael Sherrard QC

I    ($1,217,042.76). Having studied the chronology of the proceedings set out in the first two appendices of the objections submitted, he formed the view that the amount claimed by Sherrard QC, who was replaced by David Hunt QC in October

1991, was 'clearly unreasonable'. He did not allow the 20 items claimed. The    **A**
deputy registrar then referred to the basic guidelines for assessing the reasonable
amount of counsel's fees as set out by Pennycuik J in *Simpson's Motor Sales
(London) Ltd v Hendon Corp* [1964] 3 All ER 833. He could have given a global
figure for section 1 of the bill. But he was prepared to assess separately the costs
for counsel and solicitors. He was of the view that a sum of $1,190,000 was
reasonable for the work done by the two Queen's Counsels. There was duplication    **B**
of and overlapping work between the two Queen's Counsels broadly in terms of
proofs of evidence, pleadings and researches on and opinion of the issues of law.
Learned counsel for Kartika had suggested the sum of $400,000.00 for counsels'
work but this was thought as 'inadequate and inordinately low'.

12   In respect of the solicitors' work, he was of the view that $560,700.00 was the    **C**
worth of the work of all the solicitors in question. From 1977 to June 1991 when
Shook Lin & Bok took over the matter from Mr Siva Selvadurai, the costs claimed
were $1,772,519.67. This was $500,000 more than what was claimed by Sherrard
QC who rendered professional services over more or less the same period. As had
been noted, substantial costs had been paid for a part of the period in question. The
work which had to be assessed were the settling and amendments of the pleadings,    **D**
summons for directions, application for the unless order, interrogatories,
extension of time and the costs for the preliminary issues before the High Court
and the Court of Appeal.

13   It was pointed out by the deputy registrar that from June 1991 to January 1992
when Messrs Wong Meng Meng took over the matter from Messrs Shook Lin &    **E**
Bok the costs claimed for that period was $2,025,000. This was almost double that
claimed by David Hunt QC. This comparison led to a reference of the general
remark of the Court of Appeal in *Jeyaretnam Joshua Benjamin v Lee Kuan Yew*
[1993] 1 SLR 185 at p 193 that 'where a Queen's Counsel has been briefed on a
matter and appears at the hearing, the load on the solicitor in charge of the matter
is considerably reduced and he has a less onerous role to play'. He was of the view    **F**
that the costs of Messrs Shook Lin & Bok and Messrs Wong Meng Meng should
be in the range of $480,000 to $520,000. He doubted that 18,984 hours had been
spent for getting-up. He thought it was unlikely that between July 1991 and March
1992, seven lawyers were working full time for ten hours daily. He also did not
accept that between June 1991 and end January 1992 seven lawyers were working    **G**
12 hours daily for 202 days. He therefore assessed the worth of the work done by
three sets of solicitors at $560,700.00.

*The review in the High Court*

14   Counsel for Pertamina raised a question of principle and also sought a review
of the quantum. He wanted it established that management time of solicitors was    **H**
claimable. He told me that his team was so busy and the firm had not put in place
time sheets. Therefore no time sheets were kept. What was said was that even if
that was the measure, it would have amounted to only $140 per hour: see pp 35E
to 37E of the notes of arguments before the deputy registrar. He had mentioned
this fact to the deputy registrar who was therefore mistaken in concluding that it
was claimed by the solicitors that in truth and in fact 18,984 hours were spent.    **I**
Counsel for Kartika drew my attention to p 121 of the bill of costs, which was at

A   the tail end of 106 pages of particularisation of each individual step taken by the solicitors, where it was stated as follows: 'Amount of time spent for getting up: 18,984 hrs.' As clarified by counsel for Pertamina, which I accepted, it was not their assertion that in fact 18,984 hours were spent by solicitors. However, it was clear that the statement in the bill of costs was itself a mistake which prompted the deputy registrar to deal with it in the manner he did.

B

15   Counsel for Pertamina tested the reasonableness of their claim to $2,676,000 for the costs of solicitors on a different footing. He broke it down, like the way he did before the deputy registrar. Between 20 June to end August 1991, which admittedly was the intensive period, if the lead solicitor had worked eight hours on the average per day, then over 70 days, he would have worked 560 hours. For

C   the period from 1 September to 30 December 1991, if he had worked 40 days out of 120 days, he would have worked 320 hours. Again, if the lead solicitor had worked 40 days between 1 January to 3 April 1992, he would have clocked another 320 hours. That would make a total of 1,200 hours. And on the assumption that he is remunerated at the rate of $600 per hour his work is worth $720,000. Then counsel for Pertamina postulated that if each of the other five lawyers worked at

D   least 1,500 hours that would mean that 7,500 hours would be spent. When multiplied by the reasonable rate of $250 per hour, the costs of the five lawyers would be $1,875,000. All told, the total would be $2,595,000.00.

16   Alternatively, counsel for Pertamina referred to the time sheets admittedly kept by Messrs Allen & Gledhill. The solicitors spent a total of 4,160 hours. If we

E   applied to it the rate of $250 per hour, one would arrive at about $1m. Counsel for Pertamina went on to say that if one doubled the time spent by the solicitors for Pertamina, then obviously the reasonable costs would be about $2m.

17   It will be recalled that the sum of $198,992.20 had been awarded for an earlier part of the work done. If that sum is added to the sum of $560,700.00, which the

F   learned deputy registrar awarded under this bill of costs, the total awarded for all the work done is $759,692.20. He had awarded the sum of $1,190,000.00 for the work done by the two Queen's Counsels. The question before me is whether those sums awarded for the work done by counsel and by the solicitors is fair and reasonable. I have given the matter considerable and rather anxious thought, after having reviewed the voluminous documents and the notes of evidence to see the

G   amount of the getting-up in all its varied and complex aspects. At the conclusion of this review, I was not persuaded at all that the learned deputy registrar had misdirected himself in any way. I was not unaware, as counsel for Pertamina pointed out, that the solicitors of Kartika had themselves worked a total of 4,160 hours and that it was strongly canvassed before me that multiplying it at the rate

H   of $250 per hour would have yielded the aggregate sum of about $1m. It was even suggested that if the time was doubled, the aggregate would be $2m. The process of assessment of party and party costs is not a matter of mathematical multiplication, with assumed multiplier and multiplicand, nor are time sheets conclusive of the total amount of time which reasonably would have been spent on any particular aspect of the getting-up. They are, however, valuable as guides

I   which will assist in the process of assessment. I would confirm the assessments of the learned deputy registrar.

18   I should, however, make the further point that I accepted that the last set of solicitors and Queen's Counsel of Pertamina had done extensive work after they took over. They also had to carry out the work in an air of urgency. Counsel would have had to give a number of advice on proof of evidence and on the protracted processes of discovery. The solicitors have had to contend with very poor documentation. As was indicated to the court repeatedly during the trial, the documents were not well kept in the first place owing to the rather poor state of the administration in Pertamina during the relevant period. The turmoil which Pertamina went through after sweeping changes at their top management level greatly exacerbated what was already a very unsatisfactory state of affairs. It would be fair to say that the claims against Kartika did not occupy the attention it deserved from the management of Pertamina for long periods of time. Everything went stale and many of the documentary trails, having gone cold, had to be reconstructed. The result was that many of the documents were secondary documentary evidence. I hope it is abundantly clear by now that much of the additional work done was directly due to factors for which Kartika could not conceivably be made to pay.

19   Finally, I refer to the other items in the bill of costs for which review is sought by both Kartika and Pertamina. The learned deputy registrar had dealt with each and every one of them in great detail. I have nothing useful to add except to add my endorsement to each of the awards. Pertamina must pay to Kartika and the estate the costs of this review.

*Application dismissed.*

Reported by S Surenthiraraj

# EXHIBIT D-6

# Singapore Airlines Ltd & Anor v Fujitsu Microelectronics (Malaysia) Sdn Bhd & Ors (No 2)

A

COURT OF APPEAL — CIVIL APPEAL NO 21 OF 2000
YONG PUNG HOW CJ, LP THEAN AND CHAO HICK TIN JJA
27 SEPTEMBER 2000, 5 JANUARY 2001

B

*Civil Procedure — Costs — Offer to settle — Whether offer fell within application of O 22A r 9(3) — Whether there were grounds to vary usual costs order*

*Civil Procedure — Appeal — Ancillary matters — Certificate for two counsel at appeal — Whether necessary on facts of case*

C

*Civil Procedure — Appeal — Ancillary matters — Return of judgment sum paid pursuant to judgment reversed on appeal — Rate of interest payable*

D

**Facts**

On 30 November 2000 the Court of Appeal allowed the appellant's appeal but reserved the question of costs for parties to make their submissions. The appellants argued that they were entitled, pursuant to O 22A r 9(3), to costs for the action and the appeal, on an indemnity basis from the date of their offer to settle. This was because the judgment sum was not more favourable than the offer to settle. The appellants also sought costs for (i) a certificate for two counsel and (ii) a refund of judgment sum paid pursuant to the judgment reversed on appeal with interest at 6%.

E

On their part, the respondents contended that the appellants should only be entitled to 60% of the standard costs for both trial and the appeal as the appellants had failed in their defence of denial of liability, succeeding at appeal only on the issue of limitation of liability under the Warsaw Convention.

F

**Held,** allowing costs as follows:

(1) It is axiomatic to the proper application of O 22A that the offer to settle should be a serious and genuine offer and not just to entail the payment of costs on an indemnity basis. On the facts, the actual loss incurred amounted to US$286,344.14 whereas the amended Convention applied to limit the appellants' liability to only S$312. The appellants' offer to settle was for S$347. It was ludicrous to suggest that any sensible litigant would go though trial of some 20 days only to defend a claim for S$312 (see ¶ 5–9).

G

H

(2) An offer to have the effect contemplated in O 22A r 9 must contain in it an element which would induce or facilitate settlement. In the circumstances, the offer to settle of 20 January 1999 was not really an offer to settle as it did not contain any incentive to settle. Nor was there a genuine effort to settle the crux of the dispute which was related to the difference between the actual value of the lost package and the sum laid down in the amended Convention. The order on costs against the

I

A    respondents for the action (from the date of the offer), as well as the
     appeal, would be on a standard basis (see ¶ 10–12).

(3)  As the appellants failed in their defence of denial of liability, they
     would only be entitled to 80% of the costs for the trial. However, since
     no issue on liability was taken at appeal, there would be no reduction of
B    costs for the appellants in respect of the appeal (see ¶ 13).

(4)  The nature and circumstances of the case did not warrant a certificate
     for two counsel for the appeal (see ¶ 15–17).

(5)  The prescription of a rate of 6% interest under O 42 r 12 applied only
     to a judgment debt. The governing principle must be restitution from
     the respondents rather than compensation to the appellants. Hence, as
C    the respondents had acted reasonably in depositing the moneys
     received with a reputable financial institution earning interest, all that
     justice required was the return of the sums received together with
     interest earned thereon, to the appellants (see ¶ 18–23).

D    **Case(s) referred to**

     *Burton v Global Benefit Plan Consultants Inc* (1999) 93 ACWS (3d) 223
        (folld)

     *Data General (Canada) v Molnar System Group* (1991) 85 DLR (4th) 392
        (folld)

E    *Endurance 1, The* [1999] 1 SLR 661 (folld)
     *Meerkin v Rossett* (1999, unreported) (folld)
     *Rodger v Comptoir* (1871) LR 3 8C 465 (folld)
     *Stanley v Phillips* (1966) 115 CLR 470 (folld)
     *Tickell v Trifleska* (1991) 25 NSWLR 353 (folld)

F
     **Legislation referred to**
     Rules of Court O 22A r 9, O 42 r 12

     **Lawyers**
G    *P Selvadurai, Lok Vi Ming* and *Lawrence Teh (Rodyk & Davidson)* for the
     appellants.
     *Belinda Ang Fong* SC and *Gerald Yee (Ang & Partners)* for the respondents.

                                                              *Cur Adv Vult*

H
     **Chao Hick Tin JA** (delivering the judgment of the court): On 30 November 2000
     this court allowed the appeal of the appellants where it held that the appellants
     were entitled to the protection of the limitation of liability laid down by the
     Warsaw Convention, as amended by the Hague Protocol, (amended Convention)
     in relation to the loss of a package (one of seven packages) carried by the first
I    appellant from Tokyo to Kuala Lumpur via Singapore. [See [2001] 1 SLR 241.]
     However, as requested by the appellants, the question of costs was reserved.
     Parties were directed to make their submissions in relation thereto.

*Offer to settle*                                                                     A

2    These are the additional material facts, relating to costs, which were brought
to our attention. The writ in this action was instituted on 16 April 1998 and served
on the appellants on 2 October 1998. On 20 January 1999, the appellants offered
to settle the action 'for the sum of S$347 including interest, in full and final
settlement of the [respondents'] claim against [the appellants] with costs, up to      B
and including the service of the notice, to be assessed.' This offer was not accepted
by the respondents and it was never withdrawn by the appellants.

3    The appellants say that in view of the fact that as the judgment sum obtained
by the respondents for the loss of the package (based on the limitation of liability)
is not more favourable than the offer to settle, the appellants should be entitled,      C
pursuant to O 22A r 9(3), to costs for the action and the appeal, on an indemnity
basis from the date of the offer to settle.

*Relevant provisions*

4    We will now set out the relevant rules of court:                                    D

Order 22A r 9(3)

Where an offer to settle is made by a defendant —

(a)   ...
(b)   is not accepted by the plaintiff, and the plaintiff obtains judgment not more      E
      favourable than the terms of the offer to settle,

the plaintiff is entitled to costs on the standard basis to the date the offer was served and
the defendant is entitled to costs on the indemnity basis from that date, unless the Court
orders otherwise.

Order 22A r 12                                                                           F

Without prejudice to Rules 9 and 10, the Court, in exercising its discretion with respect
to costs, may take into account any offer to settle, the date the offer was made, the terms
of the offer and the extent to which the plaintiff's judgment is more favourable than the
terms of the offer to settle.

5    In *The Endurance 1* [1999] 1 SLR 661 this court had the occasion to consider       G
the rationale and scope of O 22A rr 9 and 12, and having reviewed some decisions
of other jurisdictions (Ontario, Canada and New South Wales, Australia) where
similar procedures existed, said (at pp 679–680):

The rationale or the principle behind O 22A is perfectly clear ... it is to encourage the
termination of litigation by agreement of the parties — more speedily and less           H
expensively than by judgment of the court at the end of the trial.
    In our considered view where there is no defence of any substance to a liquidated
sum, then in line with the principle behind O 22A, compromise is not a necessary
element in the offer to settle. However, the lack of compromise would be a material
consideration in determining whether the plaintiff or the defendant should be penalised
with higher costs in cases where there are genuine issues of liability raised. This applies   I
to both liquidated and unliquidated claims. In each case an exercise of discretion is
called for (see O 22A r 9(1) and (2) '... unless the Court orders otherwise' and also
O 22A r 12).

A      In our considered view, also, it is axiomatic to the proper application of O 22A that the offer to settle should be a serious and a genuine offer and not just to entail the payment of costs on an indemnity basis. This is particularly so where the claim is for an unliquidated sum to be ascertained. In our view an offer to settle for a percentage of an unliquidated sum to be ascertained, as the claims in this case for damages to be assessed, cannot by any means be said to be a serious and a genuine offer to settle. It runs counter

B      to the principle behind O 22A as stated in ¶ 43 above. An assessment of damages, even where liability is a matter of course, can give rise to numerous complexities and result in protracted hearings and expense.

     What, in our view, is required is for the plaintiff to make his own estimate of what the unliquidated sum ought to be or his own assessment of what the damages ought to be and to offer that sum as being a fair and reasonable sum which the defendant ought

C      to pay in settlement of his claim.

     We respectfully adopt the words of Morden ACJO in *Data General (Canada) Ltd v Molnar System Group* that 'the impetus to settle is a mechanism which enables a plaintiff to make a serious offer respecting his or her *estimate of the value of the claim* which will require the defendant to give early … and careful consideration to the merits of the case'. [Emphasis added.]

D     6    In a recent Canadian case, *Burton v Global Benefit Plan Consultants Inc* (1999) 93 ACWS (3d) 223, the court struck out the claim of the plaintiffs against the fifth defendant and dismissed the action. Prior to the dismissal, the fifth defendant offered to settle the plaintiffs' claim for $1 'in full settlement of all costs, damages and interest,' which offer was not accepted. The question that arose was whether the fifth defendant should be entitled to only party-and-party

E      costs or solicitors and client costs from the date of the offer. The court held it was clear that the offer was a nominal offer, agreeing only to forego any claim for costs up to the date of the offer; it was an instance where the plaintiffs were asked to capitulate and receive little, if anything, in return. Orsborn J agreed with the decision of the Ontario Court of Appeal in *Data General (Canada) Ltd v Molnar*

F      *System Group* (1991) 85 DLR (4th) 392, that an element of compromise was not an essential element to constitute an offer to settle within the rules but the absence of such an element might be taken into account in deciding whether or not, in any particular case, the interests of justice and fairness required a departure from the presumptive solicitor-client costs consequences of the rule. Orsborn J also, having reviewed some Canadian cases on how the discretion should be exercised,

G      lamented that they did not demonstrate any predictability. While recognising that this was unfortunate, he said:

     but if the interests and fairness and justice demand a different outcome than that required by predictability the interests of justice and fairness should prevail.

    7    Thus in this instance, while there was an offer to settle, is it an offer on which

H      we should allow the prima facie consequences of O 22A r 9(3) to apply or should we order otherwise. The present action was for the recovery of the loss suffered by the respondents on account of the package which was not delivered, the actual value of which was US$286,344.14. However, if the limitation of liability under the amended Convention were to apply, the appellants' liability would be limited to S$312. While it is true that at the trial the appellants did dispute their liability

I      for the loss, that was not the main issue. It is ludicrous to suggest that any sensible litigant would go through a trial of some twenty days only to defend a claim for S$312. We think that the denial of liability was taken for strategic reasons, rightly

or wrongly, in order not to jeopardise in any way their real defence of limitation     A
of liability. This was obvious from the fact that the appellants offered to settle in
accordance with the limitation laid down in the amended Convention. The
respondents would have known as much.

8     The present situation is not unlike that in *Data General* where the plaintiffs
offered to settle for 100% of the liquidated sum claimed and the Ontario Court of     B
Appeal of Canada held that due to the complexities of the case which reasonably
gave rise to uncertainties as to liability, it was not appropriate to allow costs on an
indemnity basis.

9     Similarly in *Tickell v Trifleska Pty Ltd & Anor* (1991) 25 NSWLR 353 the
plaintiff made an offer to compromise for 100% of the amount claimed. The     C
Supreme Court of New South Wales, Australia, held that costs on an indemnity
basis should not be awarded to the plaintiffs. The following observations of Roger
CJ are germane:

> It was never in the minds of the draftsmen of the rule, or members of the Rule
> Committee responsible for the passing of this rule, that Pt 22 should be utilized simply     D
> as a statutory demand which, other circumstances being equal, will automatically entail
> the payment of costs on an indemnity basis.

10    Even though the relevant NSW rules are not identical in wording with ours,
we would respectfully agree with those views. In our opinion, for an offer to have
the effect contemplated in O 22A r 9, it must contain in it an element which would     E
induce or facilitate settlement. When such an element is missing, then, as held in
*Data General*, that would be a ground for the court to exercise its discretion to
vary the norm relating to costs laid down in r 9.

11    In the context of the present case, we had no hesitation in holding that the
offer to settle of 20 January 1999 was not really an offer to settle as it did not in     F
substance contain any incentive to settle. The crux of the dispute related to the
difference between the actual value of the lost package and the sum laid down in
the amended Convention as being payable to the respondents for the loss. On that
real issue, there was no genuine or serious effort to seek a compromise.

12    For these reasons, we would, in exercise of our discretion, order that costs     G
against the respondents for the action (from the date of the offer), as well as the
appeal, be on the standard basis.

13    However, the respondents further contend that the appellants should only be
entitled to 60% of the standard costs for both the trial and the appeal, as the
appellants had failed in their defence of denial of liability. Here, we note that in     H
our main judgment we stated, mistakenly, that the question of liability was not
taken up by the appellants at the trial. Be that as it may, at the appeal it was
certainly not an issue. We could see some merits in this contention, as far as the
trial was concerned. The issue of liability was taken by the appellants, though
perhaps for strategic reasons. Nevertheless, they should not be given costs on an
issue on which they failed. Thus for the trial we order that the appellants should     I
only be entitled to 80% of the costs. As for the appeal, no issue on liability was
taken. The appellants' case dealt entirely with the question of limitation of liability

**A**    under the amended Convention. Therefore, there will be no reduction of costs for the appellants as far as the appeal is concerned.

14   We should add that the appellants have conceded that the respondents should be entitled to the costs of the action from the institution of the writ up to the date of the offer on the Subordinate Courts scale (as the sum on which the respondents

**B**    succeeded fell well within the Subordinate Courts' jurisdiction), and we do so order.

*Certificate for two counsel*

15   The appellants have also argued for a certificate for two counsel in respect of

**C**    the appeal on the ground that 'the issues of aviation law with which the appeal was concerned were complex' and required 'specialist knowledge'. The appellants also contended that the appeal gave rise to questions of general public importance.

16   We do not think the nature and the circumstances of the case warrant the issue of a certificate for two counsel for the appeal. The central issues in the appeal

**D**    related to the construction of the relevant provisions of the amended Convention and the application of the appropriate construction of those provisions to the facts. In this regard, we concur with the views of Barwick CJ in *Stanley v Phillips* (1966) 115 CLR 470 where he said:

The question is whether the services of more than one counsel are reasonable necessary

**E**    for the adequate presentation of the case.

17   We do not think the appeal presented issues of such complexity which required the services of two counsel. There was nothing very technical. The facts were all in the record of appeal. Accordingly, we would refuse the request.

**F**    *Refund of payment made with interest*

18   Finally, an ancillary matter raised by the appellants relates to the repayment of the payments made by the appellants to the respondents in satisfaction of the judgment of the court below. The appellants seek the refund of those payments with interest at 6%.

**G**    19   We are informed by the respondents that they had placed the monies received (judgment sum plus interest) in an interest bearing account with a reputable financial institution in Singapore. The respondents are willing to release the monies received, plus any interest earned and less bank charges incurred.

20   There does not appear to be any statutory provision which lays down the rate

**H**    of interest payable in respect of the return of judgment sum paid pursuant to a judgment which is reversed on appeal. Order 42 r 12 prescribes a rate of 6% but that applies only to a judgment debt.

21   There is, however, high authority which declared that such a return of money should be with interest. In *Rodger v Comptoir* (1871) LR 3 PC 465 the Privy

**I**    Counsel stated:

It is contended, on the part of the respondents here, that the principal sum being restored to the present petitioners, they have no right to recover from them any interest. It is

A

obvious that, if that is so, injury, and very grave injury, will be done to the petitioners. They will by reason of an act of the court have paid a sum which it is now ascertained was ordered to be paid by mistake and wrongfully. They will recover that sum after the lapse of a considerable time, but they will recover it without the ordinary fruits which are derived from the enjoyment of money. On the other hand, those fruits will have been enjoyed, by the person who by mistake and by wrong obtained possession of the money under a judgment which has been reversed. So far, therefore, as principle is concerned, their Lordships have no doubt or hesitation in saying that injustice will be done to the petitioners, and that the perfect judicial determination which it must be the object of all courts to arrive at will not have been arrived at unless the persons who have had their money improperly taken from them have the money restored to them, with interest, during the time that the money has been withheld.

B

...

Their Lordships, therefore, so far as any precedents applicable to the case are concerned, believe that the precedents will be found to be in favour of a restitution of the money with interest. They are quite satisfied, that this practice is in accordance with the true principle to be applied to this case, and with what the justice of such a case demands ...

C

22   It will be noted that the governing principle enunciated in *Rodger* was restitution. The principle of restitution was adopted and reiterated by, inter alia, the Court of Appeal of the State of Victoria, Australia, in *Meerkin v Rossett Pty Ltd* (1999, unreported), where Callaway JA also dealt with the question of the rate of interest, as follows:

D

Counsel's alternative submission was that we should prefer the 'wider view' identified by Fitzgerald P in *Idemitsu Queensland Pty Ltd v Agipcoal Australia Pty Ltd* (1966) 1 Qd R 26 in preference to the 'narrower view' adopted by Brooking J in the *Bond Brewing Holdings* case. The wider view is, in substance, that the court should focus on the loss that the appellant has sustained by satisfying the judgment. The narrower view is that the court should focus on the fruits of the judgment that the respondent has, or is presumed to have, enjoyed. Counsel submitted that the authorities to which Brooking J referred may be interpreted in a different sense, but I am not persuaded that his Honour's analysis is wrong and I note that, notwithstanding the reservation expressed by Davies JA in the *Idemitsu* case at p 51 line 49 to 52 line 3, the rest of his Honour's judgment refers exclusively to the position of the respondents. See also *State Bank of New South Wales v Commissioner of Taxation* (1995) 62 FCR 371 at p 380–381. An appellant court is concerned to do justice to the parties, not solely to the appellant. The error was made by the court below, not by the respondent. There is no right to compensation as against the respondent not only to restitution. If interest measured by the appellant's loss is awarded, all that the court will do is to shift the injustice occasioned by the erroneous judgment from the appellant to the respondent.

E

F

G

...

The position of the respondent to an appeal is sui generis. It has had the benefit of a judgment and the moneys that it has received are its own, but there is a risk that the judgment may be set aside. The presumption in favour of the judgment and the fact that the moneys belong to the respondent favour a higher rate, for the respondent will not be heard to say that it did not earn a reasonable rate of return on its own moneys. If it dissipated them, that was by choice, whether the choice was made then or at some earlier time, as in the case of moneys that have to be applied to reduce an overdraft. The respondent's position is not, however, indefeasible and that consideration points towards a lower rate. It will be entitled to say that it dealt with the moneys mindful of the fact that, if the appeal were allowed, it would be ordered to repay them. A cautious, or perhaps ultracautious, respondent might invest the judgment sum in a series of bank bills or term deposits while the appeal is waiting to be called on and thereafter at call.

H

I

A      The court is concerned with the fruits, or presumed fruits, of the judgment rather than the costs of borrowing equivalent funds. In my opinion an appellate court should not apply the trustee rate or the mercantile rate as such or commercial rates struck for quite different purposes. It should apply a rate of interest which, taking all the relevant circumstances into account, does justice as between the appellant and the respondent to an appeal.

B      23   In our judgment, in order to do justice to both the parties, the court must focus on restitution from the respondents rather than compensation to the appellants. Here, the respondents had acted reasonably when they placed the moneys received with a reputable financial institution earning interests. All that justice requires is that they should return the sums received, plus whatever interest earned thereon, to the appellants and we accordingly so order.

C

     *Order accordingly.*

Reported by May Loh

D

E

F

G

H

I

# EXHIBIT D-7

# SINGAPORE COURT PRACTICE
# 2006

*General Editor*

## Jeffrey Pinsler

LLD (Liverpool), LLM (Cambridge), LLB (Hons) (Liverpool),
FSIArb, Regional Panel Arbitrator (SIAC),
Principal Mediator (SMC), Advocate and Solicitor (Singapore),
Barrister (Middle Temple),
Professor of Law (National University of Singapore)

**LexisNexis**
Singapore • Malaysia • Hong Kong
2006

### Litigants in person — Compensatory costs (O 59 r 18A)

**18A.**     On a taxation of the costs of a litigant in person, there may be allowed such costs as would reasonably compensate the litigant for the time expended by him, together with all expenses reasonably incurred.

---

**59/18A/1. Litigant in person.** The rationale of this rule is that a person should not be deprived of his expenses in conducting the taxation proceedings merely because he is not represented by an advocate and solicitor. This rule extends to an advocate and solicitor who is a party and acts in person. The quantum is based on reasonable compensation for his time and costs. For a case involving the successful recovery of costs by a solicitor who represented himself in his firm's name, see *Malkinson v Trim* [2003] 1 WLR 463 (concerning r 48.6 of the English Civil Procedure Rules).

### Costs for more than one solicitor (O 59 r 19)

**19.—(1)**   Costs for getting up the case by and for attendance in Court of more than one solicitor for a party shall not be allowed unless the Court at the hearing or within 7 days thereof so certifies.

   **(2)**     Such costs may be allowed notwithstanding that the solicitors are members of the same firm of solicitors.

---

**59/19/1. Background to rule.** This rule governs the award of costs where more than one advocate and solicitor is involved. Under the former r 19(1) (ie prior to the 1991 amendments: Rules of the Supreme Court (Amendment No 3) Rules 1991), the term 'counsel' was defined as a 'practitioner in practice on his own account or in partnership who is not the solicitor on record and who has been briefed on behalf of a party'. The previous wording of the rule gave rise to difficulties. In *Joshua Benjamin Jeyaretnam v Lee Kuan Yew* [1993] 1 SLR 185, the senior assistant registrar allowed a sum of $136,170.30 in respect of the getting-up fee of the Queen's Counsel, and $160,000 in respect of the getting-up fee of the solicitors on the record. An application for review by the senior assistant registrar and the subsequent application for further review by a judge were dismissed. Before the Court of Appeal, it was argued that the term 'counsel', as defined in the former r 19(1), did not include members of the firm of solicitors on record. The order of the trial judge had contained the expression 'fees of two counsel'. Therefore, it was contended by the appellant, the taxation by the senior assistant registrar of the 'getting-up' fee of the solicitors was in error. The Court of Appeal dismissed this argument. It held that when an order allowing the fees of two 'counsel' is made pursuant to the rule, 'that order allows on taxation both the fee of the practitioner who is not a member of the firm of solicitors on record (for instance, the Queen's Counsel), and the fee of the advocate and solicitor who is a member of the firm of solicitors on record'. The decision of the Court of Appeal was no doubt appropriate and practical in the circumstances of the case. However, to achieve this result it was necessary to depart from the literal definition in r 19(1) and to adopt a broader meaning for the term 'counsel'. (On the basis that the judge had ordered the 'fees of two counsel' in the light of the two practitioners (one a Queen's Counsel, the other a member of the firm on record) appearing before him.)

**59/19/2. Current rule.** As a result of the difficulties mentioned in the preceding paragraph, the rule was amended to its present form. The court may allow the costs of more than one solicitor including a Queen's Counsel who has been admitted as an advocate and solicitor, and where the solicitors are members of the same firm. The rule does not mean that two or more solicitors can claim their costs in respect of general research and office work. The rule specifically limits the costs to 'getting-up' and attendance. Therefore, it must be necessary for the additional solicitor(s) to be involved in the court proceedings. (For a recent case involving the application of this rule, see *Rajabali Jumabhoy v Ameerali R Jumabhoy (No 2)* [1998] 2 SLR 489, para 4.)

   In *Joshua Benjamin Jeyaretnam v Lee Kuan Yew* (above), the Court of Appeal also considered the principles applicable to the determination of the quantum of the 'getting-up' fee. The court held that it would only interfere if the discretion of the registrar has been exercised on 'wrong principle' or the quantum allowed 'is obviously wrong'. The court found that the award of $136,170.30

A   **Management Corporation Strata Title No 473 v De Beers Jewellery Pte Ltd**

COURT OF APPEAL — CIVIL APPEAL NO 600105 OF 2001
B   YONG PUNG HOW CJ, CHAO HICK TIN JA AND TAN LEE MENG J
20 FEBRUARY, 6 MARCH 2002

*Land Law — Strata title development — Management corporation — Levies by
management corporation — Whether management corporation had acted ultra vires the
Land Titles (Strata) Act (Cap 158, 1999 Ed) in demanding one-time flat-rate contribution*
C   *of $200,000 from subsidiary proprietor for upgrading of lifts — Whether levy may be
upheld in contract — Land Titles (Strata) Act (Cap 158, 1999 Ed) ss 42(2), 48(1)(n)(ii)
& (q)*

*Land Law — Strata title development — Management corporation — Levies by
management corporation — Whether management corporation had acted ultra vires the*
D   *Land Titles (Strata) Act (Cap 158, 1999 Ed) in demanding contribution of $170,000 from
subsidiary proprietor for maintenance of new common property created in subdividing
strata title lots — Whether levy may be upheld in contract — Power of management
corporation to raise contributions incidental to s 12(2) of Land Titles (Strata) Act
(Cap 158, 1999 Ed) — Land Titles (Strata) Act (Cap 158, 1999 Ed) ss 3, 42(5), 48(1)(b)(i),*
E   *(m)(i) & (q)*

*Land Law — Strata title development — Common property — Common corridor —
Subdivision of four strata title lots into 18 resulting in creation of new common corridor —
Responsibility for maintaining new corridor — Legality of contribution levied by
management corporation for maintenance of new corridor — Land Titles (Strata) Act*
F   *(Cap 158, 1999 Ed) ss 3 & 48(1)(b)(i)*

*Land Law — Strata title development — Common property — Roof — Responsibility for
maintaining roof — Whether management corporation may be absolved of its duties under
s 48 of Land Titles (Strata) Act (Cap 158, 1999 Ed) — Land Titles (Strata) Act (Cap 158,
1999 Ed) ss 3 & 48(1)(b)(i)*
G

*Restitution — Money paid under mistake — Recovery of moneys paid under mistake of law
— Judicial abrogation of rule against recovery of moneys paid under mistake of law*

*Restitution — Money paid under mistake — Recovery of moneys paid under mistake of law*
H   *— Defences*

*Civil Procedure — Interest — Interest rate — Period — Court's power to award interest
— Discretion to award interest from stipulated dates at specified rates — Whether
exercised correctly — Civil Law Act (Cap 43, 1999 Ed) s 12(1)*
I

*Civil Procedure — Costs — Costs for more than one solicitor — Entitlement — Rules of
Court O 59 r 19*

Case3:05-cv-00646-EMC Document209-2 Filed12/14/09 Page48 of 67

**Facts**
A

The appellant is the management corporation of People's Park Complex. In 1988, the respondent bought four penthouse units, intending to convert them into 18 maisonette units. It required the appellant's permission to do so. The appellant imposed conditions for its granting permission, including the payment of $200,000 for upgrading the lifts, the payment of $170,000 for
B
maintaining new common areas and the registration of covenants in the 18 new subsidiary strata certificates of title that the subsidiary proprietors would maintain the roof above the units. Between 1992 and 1993, the respondent accepted the conditions and paid over the money.

In December 2000, the appellant sued the respondent for maintenance contributions. In March 2001, the respondent counterclaimed for the
C
$370,000, on the grounds that the conditions were ultra vires and that it had paid the money while under a mistake of law.

The judge held that the conditions were ultra vires the Land Titles (Strata) Act (Cap 158, 1999 Ed) ('LTSA'). She abrogated the rule against recovery of payments made under a mistake of law, and held that the
D
respondent could recover the money. She also declared that the appellant, not the respondent or its successors, was responsible for maintaining the roof. She found that the appellant did not succeed on any of the defences pleaded. The appellant appealed.

**Held**, dismissing the appeal:
E

(1) There was no reason to overturn the judge's finding that the impetus for upgrading the lifts was not the increased traffic that would allegedly have resulted from the conversion of the penthouse units (see ¶7). In any case, the appellant acted ultra vires LTSA s 42(2) by demanding a flat-rate contribution of $200,000 instead of one proportional to the
F
share value of the relevant lots (see ¶8). Any contract circumventing s 42(2) would be void, as it would defeat the comprehensive and carefully drafted provisions of the LTSA (see ¶10).

(2) The appellant acted ultra vires LTSA s 42(5) because it had demanded the $170,000 without the approval of the Commissioner of Buildings (see ¶12 and 13). LTSA s 12(2) did not afford the appellant another
G
route to raise contributions: the court did not recognise any powers to raise contributions incidental to s 12(2) as s 42 had expressly and exhaustively provided for such powers. Moreover, giving the appellant such incidental powers would undermine the scheme of the LTSA (see ¶15). Any contract circumventing s 42(5) would also be void (see ¶16).
H

(3) The rule against recovery of a sum paid under a mistake of law was abrogated (see ¶21). The court decided to change the law judicially because it did not know if, and when, Parliament would legislate on the issue; moreover, it was not usurping the legislative function by so doing (see ¶22). There was no need to amend s 29 of the Limitation Act (Cap 163, 1996 Ed) to provide for the change (see ¶24). On the facts,
I
the respondent had paid the sums under a mistake of law, and would not have paid but for that mistake (see ¶25 and 28).

A (4) The declarations were allowed to stand as the appellant could not evade its responsibility under LTSA s 48(1)(b)(i) for maintaining the roof, which was common property (see ¶30). Any contract circumventing s 48(1)(b)(i) would also be void (see ¶31).

 (5) Defences pleaded before the judge: (a) The counterclaim was not time-barred (see ¶32). (b) It was not defeated by laches because the
B respondent could not have known of the mistake for long, and the appellant was not prejudiced by the delay (if any) (see ¶33 and 34). (c) The appellant had changed its position with regards to the $200,000, and this change was bona fide. However, it would not have been inequitable to require the appellant to make full restitution because it
C would have upgraded the lifts in any case (see ¶36). There was no evidence that the appellant had changed its position with regards to the $170,000 (see ¶37).

 (6) Defences raised on appeal: the appellant was allowed to raise these because the test in *A-G for the Straits Settlements v Pang Ah Yew* [1934] MLJ 184 was satisfied (see ¶38 and 39). (a) The defences of
D settlement of an honest claim and compromise failed because the respondent believed that the appellant had the authority to make the demands (see ¶40 and 41). (b) The court did not recognise honest receipt as a defence (see ¶42). (c) The court did not think it appropriate to recognise estoppel by convention as a defence yet (see ¶43). (d) The respondent could not have known of, and raised, its counterclaim when
E it was previously sued by the appellant, hence it could not be said to be abusing the process of the court (see ¶45).

 (7) The court did not interfere with the judge's discretion to award the respondent interest at five percent until June 1995, but ordered that interest thereafter be at the rate of six, instead of ten, percent (see ¶56).

F (8) The court did not interfere with the judge's discretion to award costs to the respondent (see ¶58 and 61). The court also certified that costs for two solicitors be allowed (see ¶61).

**Case(s) referred to**

*A-G for the Straits Settlements v Pang Ah Yew* [1934] MLJ 184 (folld)
G *Avon County Council v Howlett* [1983] 1 All ER 1073; [1983] 1 WLR 605 (refd)
*BP Exploration Co (Libya) v Hunt (No 2)* [1983] 2 AC 352; [1982] 1 All ER 925 (folld)
*Beale v Kyte* [1907] 1 Ch 564 (refd)
H *David Securities v Commonwealth Bank of Australia* (1992) 175 CLR 353; 66 ALJR 768 (not folld)
*Elgindata (No 2), Re* [1993] 1 All ER 232; [1992] 1 WLR 1207 (folld)
*Kleinwort Benson v Birmingham City Council* [1996] 4 All ER 733; [1996] 3 WLR 1139 (refd)
*Kleinwort Benson v Lincoln City Council* [1998] 4 All ER 513; [1998] 3
I WLR 1095 (folld)
*Lindsay Petroleum Co v Hurd* (1874) LR 5 PC 221 (folld)
*Lipkin Gorman v Karpnale* [1991] 2 AC 548; [1992] 4 All ER 512 (folld)

*Nurdin & Peacock plc v DB Ramsden & Co* [1999] 1 All ER 941; [1999] 1                    A
    WLR 1249 (folld)
*Seagate Technology v Goh Han Kim* [1995] 1 SLR 17 (refd)
*Serangoon Garden Estate v Chye Marian* [1959] MLJ 113 (overd)
*Tasmania, The* (1890) 15 App Cas 223 (refd)
*Tullio v Maoro* [1994] 2 SLR 489 (folld)
                                                                                          B

**Legislation referred to**
Civil Law Act (Cap 43, 1999 Ed) s 12(1)
Land Titles (Strata) Act (Cap 158, 1999 Ed) ss 3, 12(2), 42(2), (5),
    48(1)(b)(i), (m)(i), (n)(ii), (q)
Limitation Act (Cap 163, 1996 Ed) s 29                                                    C
Rules of Court O 59 r 19
Law Reform (Miscellaneous Provisions) Act 1934 [UK] s 3(1)


**Appeal from:** Suit No 1053 of 2000
                                                                                          D

**Lawyers**
*Michael Hwang* SC, *Andrew Chan*, *Desmond Ho*, *Mohd Reza* (*Allen &
Gledhill*) and *Benjamin Sim* (*Kelvin Chia Partnership*) for the appellant.
*Harpreet Singh Nehal*, *Gerald Kuppusamy* and *Shirin Tang* (*Drew &
Napier LLC*) for the respondent.

                                                                                          E
                                                                *Cur Adv Vult*


**Yong Pung How CJ** (delivering the judgment of the court): This was an appeal
from the decision of Justice Judith Prakash ('the judge'), in which she upheld the
respondent's counterclaim for a reimbursement of certain sums which it had paid
to the appellant. She also granted two declarations in terms requested by the        F
respondent.

*The facts*

2    The appellant is the management corporation of People's Park Complex, a
mixed use development in the Chinatown area. In 1988, the respondent bought        G
four penthouse units (occupying the top two storeys), which it intended to convert
into 18 maisonette units. It required the appellant's permission to do so.
Discussions took place from 1989 to 1993. During that time, the respondent paid
$200,000 towards the cost of upgrading the lifts and $170,000 towards the cost of
maintaining part of the common property. The facts will be dealt with in greater
detail below.                                                                         H

3    On 12 December 2000, the appellant sued the respondent for maintenance
contributions and other payments for the 18 units. On 27 March 2001, the
respondent counterclaimed for the $370,000. The respondent also sought
declarations relating to the maintenance of the roof above the 18 units. On
19 February 2001, the appellant obtained summary judgment for its claim, but        I
execution was stayed pending the trial of the respondent's counterclaim. The
counterclaim was heard by Justice Prakash in July 2001.

A   *The judge's decision*

4    The judge delivered her judgment on 31 July 2001. She first set out the facts and procedural history. She then identified the issues and dealt with them as follows (these issues are not classified in the same way as we have classified the issues arising in this appeal):

B

(1)  No contract existed between the parties. As the respondent was in the position of an applicant, and the appellant in the position of a licensing body, there was no intention to create legal relations.

(2)  The appellant's demands of $200,000 and $170,000 were ultra vires s 42(2) and (5) of the Land Titles (Strata) Act (Cap 158, 1999 Ed) ('LTSA') respectively. The demands could not be legitimised by anything outside the LTSA framework.

C

(3)  The respondent had paid the sums under a mistake of law. It was time for the Singapore courts to abrogate the rule against the recovery of payments made under a mistake of law.

D   (4)  The respondent could not claim the money under the *colore officii* principle, as the appellant is not a public, quasi-public or monopolistic body. (This is not an issue in the appeal and will not be dealt with here.)

(5)  The counterclaim was not time-barred because it did not fall within the provisions of the Limitation Act (Cap 163, 1996 Ed).

(6)  At all times, the appellant had a statutory duty to maintain the roof of the building, hence it could not require the respondent to do so. Therefore the court granted the declarations sought by the respondent.

E

(7)  The appellant did not succeed on any defences pleaded:

(a)  The appellant could not rely on the defence of laches because: one, not much time had lapsed since the respondent could first have been aware of its cause of action; and two, no prejudice had been caused to the appellant by the time lapse.

F

(b)  The appellant failed on the defence of promissory estoppel because the respondent had not made any relevant representations to it. The respondent had merely accepted that the appellant had the power to make the demands. (The appellant did not seek to rely on this defence on appeal, and its submissions before the judge will not be dealt with here.)

G

(c)  The appellant could not establish the defence of change of position because: one, the demands for payment and that the respondent maintain the roof were ultra vires; two, the appellant would have had to upgrade the lifts anyway; and three, there was no evidence that the $170,000 had been used to maintain the common property.

H

(8)  The parties were to pay interest as follows:

(a)  The respondent was to pay the appellant simple interest on the maintenance contributions and other payments, from the date of the summary judgment, at 10%pa (this was not an issue in the appeal and will not be dealt with here).

I

(b)  The appellant was to pay the respondent simple interest:

    (i)  on $200,000: at 5%pa from February 1992 to June 1995, and at   **A**
        10%pa thereafter; and

    (ii)  on $170,000: at 5%pa from September 1993 to June 1995, and at
        10% thereafter.

The judge subsequently ordered that the respondent be awarded the full costs of
the counterclaim.                                                          **B**

*The issues*

5    The issues in this appeal were:

(1)  Whether the appellant's demand for $200,000 was ultra vires the LTSA; if it   **C**
    was, whether the parties could and did contract around the LTSA.

(2)  Whether the appellant's demand for $170,000 was ultra vires the LTSA; if it
    was, whether the parties could and did contract around the LTSA.

(3)  Whether the law allows recovery of payments made under a mistake of law;
    if so, whether the respondent in fact paid out under a mistake of law.

(4)  Whether the declarations relating to the maintenance of the roof above the   **D**
    units should have been granted.

(5)  Whether the appellant should succeed on the defences pleaded before the
    judge: time bar, laches and change of position.

(6)  Whether the appellant should succeed on the defences raised on appeal:
    settlement of an honest claim, compromise, honest receipt, estoppel by
    convention and abuse of process/extended res judicata.                  **E**

(7)  Whether other defences should be recognised, for example: payment made
    under a closed transaction, payment made under a settled view of the law,
    promissory estoppel and passing on the burden of the payment.

(8)  Whether the judge erred in awarding interest to the respondent at such rates
    and for such period as she did.                                        **F**

(9)  Whether the judge erred in awarding the full costs of the counterclaim to the
    respondent.

*First issue: whether the demand for $200,000 was ultra vires*

RELEVANT FACTS
                                                       **G**

6    In a letter dated 13 April 1989, the appellant said that it would not object to
the conversion of the four penthouse units to 18 maisonette units on condition that,
inter alia:

    A one-time contribution of $200,000 to the Management Corporation towards part of
    the cost for the modernisation of the 3 lifts serving the residential apartment (*sic*) ...   **H**

The next day, Mr Ow Chor Seng ('Mr Ow'), a director of the respondent, signed
on the letter to indicate acceptance of the conditions. The respondent paid
$200,000 by a cheque dated 10 January 1992. According to the appellant's
accounts for 1992, the money was put into the sinking fund and used to upgrade
the lifts.                                                                 **I**

7    The appellant claimed that the reason for this demand was that the increased
number of occupants in the top two storeys would place more pressure on the lifts.

A   However, at the extraordinary meeting of the management corporation held on 29 September 1992, this reason was not mentioned. Instead, the explanatory notes to the special resolution passed at that meeting stated that the lifts had to be upgraded due to wear and tear, that residents had complained about the waiting times for lifts and that shopkeepers had complained about the goods lift. The appellant tried to explain away the fact that no mention had been made of the respondent's contribution in the explanatory notes, by repeating the testimony of Mr Lim On Guan ('Mr Lim'), an employee of the appellant's managing agent:

B

> Court: Wouldn't it have helped you get the resolution passed if residents knew defendants were defraying part of this cost?
> A:   No. All kinds of questions could have come up like why not get them to pay all the costs or why convert the penthouses, why not maintain them for a more exclusive environment. We had to consider what would make it easier to get the resolution passed.

C

D   The role of a managing agent is to present all the facts to the subsidiary proprietors and allow them to decide whether to pass a resolution, not to conceal material facts and manipulate the outcome of a vote. Any misfeasance aside, it was difficult to believe that the managing agent would have been motivated by such a minor consideration to risk misinforming the subsidiary proprietors. The judge found that the impetus for upgrading the lifts was not the increased traffic that would allegedly have resulted from the conversion of the penthouse units. There is no reason to overturn this finding.

E   RELEVANT LTSA PROVISIONS

8   The starting point was s 48(1)(q) of the LTSA, which provides:

(1)   A management corporation shall, for the purposes of the subdivided building concerned —

F

(q)   from time to time, *levy, in accordance with section 42*, on each person liable therefor a contribution to raise the amounts referred to in paragraphs (m) and (n); … [Emphasis is added.]

Section 48(1)(n)(ii) allows a management corporation to raise contributions 'for the renewal or replacement of any electrical and mechanical installations existing for common use'. As the upgrading of the lifts fell within s 48(1)(n)(ii), contributions thereto should have been raised in accordance with s 42. Section 42(2) provides:

G

Contributions levied by a management corporation shall be levied in respect of each lot and shall, subject to subsections (3), (5) and (6), be *payable by the subsidiary proprietors in shares proportional to the share value of their respective lots*. [Emphasis is added.]

H

As the appellant had demanded a flat-rate contribution of $200,000, it had acted ultra vires the LTSA.

A CONTRACT CIRCUMVENTING THE LTSA?

I   9   The appellant's submission here was founded on two points. Firstly, a management corporation has the capacity to enter into contracts. This argument,

according to the appellant, would not be defeated even if the appellant was akin to
a public body, because public bodies also have the capacity to contract. It was
unfortunate that the judge likened the appellant to a licensing body, because it
allowed the appellant to go off on a tangent by submitting on principles applicable
only to public bodies. A management corporation is not a public body, but an
unlimited liability company. In any case, the issue was not whether the appellant
had the *capacity* to contract, but whether there were any contracts between the
parties.

10   The appellant's second point was that all the elements of a contract were
present, including an intention to create legal relations. The judge had found that
there was no such intention. We accepted that the dealings took place in a
commercial context, but even if all the ingredients of a contract were established,
the appellant's contract argument was untenable for the following reasons. Firstly,
it is trite law that a body created by a statute only has powers granted expressly or
by implication in that statute. A management corporation's power to raise
contributions is clearly and exhaustively provided for in s 42 of the LTSA.
Anything done outside these powers is void ab initio. Secondly, upholding
contracts which circumvent the detailed and carefully drafted provisions of the
LTSA would drive a coach and horses through it.

*Second issue: whether the demand for $170,000 was ultra vires*

RELEVANT FACTS

11   The conversion entailed a subdivision of the four strata title lots into 18. It
would also have resulted in the creation of a common corridor. In a letter dated
5 May 1993, the appellant said it would approve the strata subdivision plans on
condition that, inter alia:

> [the respondent] ... pay an outright contribution of $200,000 to [the appellant] for the
> maintenance ... of the additional common property ...

The appellant later agreed to reduce the sum to $170,000. Mr Ow signed on the
first letter to indicate acceptance of the conditions. The respondent paid $170,000
by a cheque dated 25 August 1993.

RELEVANT LTSA PROVISIONS

12   The starting point was s 48(1)(q) of the LTSA, which is reproduced in ¶8.
Section 48(1)(m)(i) allows a management corporation to raise contributions 'for
the purpose of meeting its actual or expected liabilities incurred or to be incurred
under paragraph (a), (b), (c) or (d)'. Section 48(1)(b) further provides:

> (1)   A management corporation shall, for the purposes of the subdivided building
> concerned —
>
>     (b)   properly maintain and keep it in a state of good and serviceable repair —
>
>        (i)   the common property; ...

Section 3 defines 'common property' as:

**A**    (c)  unless otherwise described specifically as comprised in any lot in a strata title plan and shown as capable of being comprised in such lot, includes —

(i)  foundations, columns, beams, supports, walls, *roofs*, lobbies, *corridors*, stairs, stairways, fire escapes, entrances and exits of the building and windows installed in the external walls of the building; … [Emphasis is added.]

**B**

As the new corridor was 'common property' within the meaning of s 48(1)(b)(i), contributions thereto should have been raised in accordance with s 42. Section 42(5), an exception to s 42(2), applied in this case:

**C**    Where a lot has been subdivided into 2 or more lots and the management corporation will incur additional expenditure in maintaining the new facilities or common property arising from the subdivision of the first-mentioned lot, *the management corporation may levy such additional contributions as may be approved by the Commissioner* on the subsidiary proprietor or his successors in title in order to recover the additional expenditure. [Emphasis is added.]

**D**    13   As Professor Teo Keang Sood (*Strata Title in Singapore and Malaysia*) has pointed out, this provision recognises that a subsidiary proprietor should not be allowed to impose the additional cost of maintaining new common property on other subsidiary proprietors, by subdividing his property. However, the interests of the subsidiary proprietor who intends to subdivide his property must also be safeguarded, hence the Commissioner's role in ensuring that the contribution imposed by the management corporation is fair. As the appellant had failed to **E**    raise the contribution in accordance with s 42(5), it had acted ultra vires the LTSA.

LTSA SECTION 12(2)?

14   The appellant submitted that s 12(2) afforded it another route to raise **F**    contributions, quite apart from s 42. Section 12(2) provides:

Where the subdivision of a lot or the amalgamation of 2 or more lots results in the creation of any additional or new common property, the subsidiary proprietor shall obtain the approval of the management corporation before lodging the strata title plan for redevelopment with the Registrar.

**G**    The appellant relied on s 12(2) in respect of both payments. However, as s 12(2) deals only with the creation of new common property, it was at most relevant only to the payment of $170,000.

15   The appellant's lengthy exploration of the legislative history of s 12(2) did not aid its case. It also claimed that a management corporation has powers **H**    incidental to those which are expressly provided for in the statute, and hence the manner in which it raised the contribution was within the powers incidental to s 12(2). These arguments failed for three reasons. Firstly, s 12(2) makes no mention whatsoever of a management corporation's authority to raise contributions in connection with granting approval. The judge did not rule out the possibility that it could charge an administrative fee, but surely such a fee could **I**    not run into hundreds of thousands of dollars. Secondly, there was no need to speculate about the extent of powers to levy contributions incidental to s 12(2), as s 42 clearly delineates a management corporation's powers to raise contributions.

Thirdly, recognising vague incidental powers would defeat the scheme of s 42;      A
this rationale is akin to the one explored in ¶10.

16   The appellant also sought to apply its contract argument to the $170,000. For
the reasons discussed in ¶¶9 and 10, this failed.

*Third issue: whether the sums are recoverable as payments made under a*      B
*mistake of law*

PRESENT LAW

17   The law in Singapore in this area, since *Serangoon Garden Estate v Chye
Marian* [1959] MLJ 113, has been that money paid out under a mistake of law —      C
as opposed to fact — is not recoverable. The key question here was whether
Singapore law should follow the example of some other Commonwealth states
and abrogate this rule. If the answer was in the affirmative, subsidiary questions
included: whether the rule should be abrogated legislatively (as in Western
Australia and New Zealand) or judicially (as in Australia, Canada, England and
South Africa); and what defences, if any, should be developed.      D

SHOULD THE LAW BE CHANGED?

18   In *Kleinwort Benson v Lincoln City Council* [1998] 4 All ER 513, the House
of Lords unanimously decided that it was time to abrogate the rule; by a majority,
it decided to do so judicially. Lord Goff referred to the Law Commission's      E
Consultation Paper No 120 on *Restitution of Payments Made under a Mistake of
Law* (1991), which cited the following as the main criticisms of the rule:

(1)  The rule was contrary to justice, which demanded that money paid under a
     mistake of law should be repaid unless there were special circumstances
     justifying its retention by the payee.      F
(2)  The distinction between mistakes of fact and mistakes of law could lead to
     arbitrary results.
(3)  Courts were tempted to manipulate the fact-law distinction in order to achieve
     practical justice. This led to uncertainty in the application of the rule.

19   The court also held that two factors in particular did not defeat a claim: firstly,      G
that the payment had been made as part of a transaction which was now closed;
and secondly, that the payment had been made on a settled view of the law. These
holdings are further discussed at ¶47–52.

20   The appellant's first objection to the abrogation of the rule was that it was
well-entrenched. Such an argument had no merit because the common law is no
stranger to judicial activism. The appellant's second objection was that the      H
abrogation of the rule would undermine certainty, as closed transactions would be
reopened and unscrambled. This contention will be addressed at ¶47–52. It will
suffice to say here that it was not a fatal objection to the abrogation of the rule.

21   Most judicial and academic opinion is in favour of bringing the law on
mistakes of law in line with that on mistakes of fact. There does not seem to be      I
any insurmountable objection once thought has been given to the scope of the new
rule and the exceptions to it.

**A**    IF THE LAW IS TO BE CHANGED, HOW SHOULD IT BE DONE?

22   The arguments in favour of judicial abrogation were as follows. Lord Lloyd in *Kleinwort Benson* (supra) gave two:

**B**     Indeed I can imagine few areas of the law in which it would be more appropriate for the House [of Lords] to take the initiative. *The mistake of law rule is judge made law. There are no considerations of social policy involved.* [Emphasis is added.]

Firstly, as the mistake of law rule was not created by Parliament, abrogating it judicially would not amount to defeating legislative intent. Secondly, as no social policy issues were involved, abrogating the rule judicially would not amount to

**C**   usurping the legislative function. Thirdly, the courts were not in a position to know if, and when, Parliament would change the law.

23   The Law Reform Committee ('LRC') of the Singapore Academy of Law ('SAL'), like the Law Commission in England, recommended in its Paper on *Reforms to the Law of Restitution on Mistakes of Law* (2001) that the rule be

**D**   abrogated by legislation. The key argument in favour of legislative intervention stemmed from a fear of opening the floodgates to the re-litigation of closed transactions. In particular, it was thought that Parliament would be better able to address two issues. The first was: whether the change in the law should have retrospective effect. The LRC of the SAL recommended that the Civil Law Act

**E**   (Cap 43, 1999 Ed) be amended to allow this. However, a judicial abrogation of the law could achieve the same if this court followed *Kleinwort Benson* (supra) in holding that a payment made under a mistake of law could be recovered even if it had been made under a completed transaction (see ¶47 and 48).

24   The second issue was: whether limitation periods should be introduced in

**F**   respect of claims founded on a mistake of law, and if so, how long they should be. Section 29(1) of the Limitation Act provides:

    Where, *in the case of any action for which a period of limitation is prescribed by this Act* —

**G**     ...

    (c)  the action is for relief from the consequences of a mistake,

    the period of limitation shall not begin to run until the plaintiff has discovered the fraud or the mistake, as the case may be, or could with reasonable diligence have discovered it. [Emphasis is added.]

**H**

No legislative intervention was needed for two reasons. Firstly, s 29 does not specify 'mistake' as either one of fact or one of law, hence it can apply equally to both. We noted that the LRC of the SAL recommended that s 29 be amended so as to clarify that it encompasses mistakes of law as well, but we did not think it absolutely necessary. Secondly, the italicised words show that s 29 was intended

**I**   to apply only to situations covered by the Limitation Act. As there was no need to extend the scope of recovery under a mistake of law further than that under a mistake of fact, there was no need to amend s 29.

APPLICATION TO THE FACTS                                                              **A**

25   In *Nurdin & Peacock plc v DB Ramsden & Co* [1999] 1 All ER 941, a case
decided after *Kleinwort Benson* (supra), the court said (at p 963):

> ... it does seem to me clear that in order to found a claim for repayment of money paid
> under a mistake of law, it is necessary for the payer to establish not only that *the mistake*
> *was made* but also that, *but for the mistake, he would not have paid the money.*   **B**
> [Emphasis is added.]

The first requirement — that there was a mistake — was satisfied. Firstly, the
judge found that the appellant itself had believed that it had the authority to make
its approval conditional upon the respondent's paying the sums demanded.
Mr Lim had been cross-examined in relation to the $200,000 payment:              **C**

> Q   At the time this letter [dated 13 April 1989, see ¶6] was written did you believe that
>     the MC had the power to impose this condition?
> A   Yes.

He had also been cross-examined in relation to the $170,000 payment:            **D**

> Q   At the time of this final offer, you still believed that the MC had the power to
>     impose the conditions it did.
> A   Yes.

26   Secondly, the judge found that Mr Ow had always been under the impression
that the appellant's demands were lawful. Mr Ow had been cross-examined in
relation to the $200,000 payment:                                               **E**

> Q   You said you had no choice. Did you protest at the meeting?
> A   No, because *I believed they had the power to do so* and I had no choice.
>     [Emphasis is added.]

He had been further cross-examined in relation to the $170,000 payment:         **F**

> Q   Aware of the EGM held on 29/9/92?
> A   Yes.

> Q   Agree you could have raised the issue of the payment of the sum of $200,000
>     [which was later reduced to $170,000] at the EGM?
> A   Yes.
>                                                                                 **G**
> Q   You did not do so.
> A   Agree.

> Q   Why not?
> A   Because at that time *we were of the opinion that the plaintiffs' action was lawful*
>     ... [Emphasis is added.]

This had not been helped by the fact that the respondent did not consult a lawyer   **H**
or an architect on the issue of whether it had a legal obligation to meet the
appellant's conditions.

27   Thirdly, the judge found that the respondent objected to the quantum
demanded rather than its liability to pay.                                       **I**

28   The second requirement — that, but for the mistake, the respondent would not
have paid — was also met. There was no reason to overturn the judge's finding

**A**  that the respondent had not paid voluntarily. The appellant argued that the respondent faced a time constraint, and would have paid the money rather than run the risk of not obtaining the appellant's approval. If, as the appellant contended, Mr Ow was a seasoned businessman and the parties had treated the transaction as a commercial one, it would have been hard to believe that, had the respondent known that the demands were ultra vires, it would have paid any more money than

**B**  it had to.

### Fourth issue: declarations requested by the respondent

RELEVANT FACTS

**C**  29  In a letter dated 5 May 1993, the appellant said it would approve the strata subdivision plans on condition that, inter alia:

> [The respondent] … cause to be registered as a covenant in each of the eighteen (18) Subsidiary Strata Certificates of Title for the 18 subdivided units to the effect that the subsidiary proprietors thereof shall maintain at their own cost the roof directly above the

**D**  18 units.

Mr Ow had signed on the letter to indicate acceptance of the conditions.

RELEVANT LTSA PROVISIONS

**E**  30  As was apparent from the strata plans, the roof had never been part of the original four penthouse units. The reasoning in relation to the new corridor applied here (see ¶12). As the roof above the units was 'common property' (as defined in s 3) within the meaning of s 48(1)(b)(i), the appellant had a duty to maintain it. Moreover, as the judge pointed out, it was not only the roof of the units, but also the roof of the entire development. The appellant's imposition of the condition

**F**  was ultra vires the LTSA, hence the judge was right in granting the following declarations:

(1) The appellant, not the respondent, was legally obliged to maintain the roof above the units.

(2) The respondent was not legally obliged to register any covenant to the effect

**G**  that the subsidiary proprietors of the 18 units had to maintain the roof above their units.

31  The appellant also sought to apply its contract argument to the covenant. For the reasons discussed in ¶9 and 10, this failed. Although the discussion in ¶10 relates to s 42, it was equally true that parties should not be allowed to absolve a

**H**  management corporation of its duties under s 48.

### Fifth issue: defences pleaded before the judge

TIME BAR AND LACHES

**I**  32  A perusal of the Limitation Act showed that a claim for unjust enrichment which was neither grounded in contract nor tort, and in which equitable relief was not sought, did not fall within the scope of the Act. Hence s 29 was irrelevant, and

there was no need for an inquiry as to when the respondent first knew of the mistake, or could with reasonable diligence have known of the mistake.

33   Laches is an equitable doctrine which considers the facts of the case rather than a fixed time bar. In *Lindsay Petroleum Co v Hurd* (1874) LR 5 PC 221, the court said that two important factors were: the length of the delay; and the acts done during that time. In measuring the length of the delay, the court in *Beale v Kyte* [1907] 1 Ch 564 said:

> … in all cases of mistake in order that laches or acquiescence may be a defence there must be notice of the error, and *time runs from the date of the notice and not from the time when the error is committed* … [Emphasis is added.]

The judge found that the respondent did not know of its mistake until during the trial: Mr Ow had paid the money while mistaken; solicitors who had acted for the respondent in earlier matters had failed to notice the mistake; and even the respondent's present solicitors had only raised the issue of mistake of law just before trial. She also said that the respondent could not reasonably have known much earlier that it had a cause of action, as money paid under a mistake of law was still not recoverable in Singapore.

34   The second factor related to the acts done from the time the mistake was made to the time when the party or parties realised the mistake. The judge found that the appellant would have upgraded the lifts anyway (see ¶7), and hence it had suffered no prejudice in relation to the $200,000. As for the $170,000, as no evidence was adduced as to whether, and how, it was spent, the appellant could not argue that it had been prejudiced by the alleged delay.

CHANGE OF POSITION

35   This was one of the defences overtly accepted in *Kleinwort Benson*. Lord Goff said (supra at p 538):

> I recognise that the law of restitution must embody specific defences which are concerned to protect the stability of closed transactions. The defence of *change of position* is one such defence; the defences of *compromise*, and *settlement of an honest claim* (the scope of which is a matter of debate), are others. It is possible that others may be developed … [Emphasis is added.]

The defence of change of position was recognised — some say, created — in *Lipkin Gorman v Karpnale* [1991] 2 AC 548. Lord Goff held that 'a bona fide change of position should of itself be a good defence'. He elaborated (at p 580):

> At present I do not wish to state the principle any less broadly than this: that the defence is available to a person *whose position has so changed that it would be inequitable in all the circumstances to require him to make restitution*, or alternatively to make restitution in full. [Emphasis is added.]

In *Seagate Technology v Goh Han Kim* [1995] 1 SLR 17, the court noted that this defence was also available in Singapore. It would seem that there are three elements to the defence:

(1)  The payee has changed his position.
(2)  The change is bona fide.

A  (3) It would be inequitable to require him to make restitution or to make restitution in full.

36  Could the appellant rely on this defence with regards to the $200,000? Firstly, it had changed its position by expending the money to upgrade the lifts. Secondly, because the appellant too had been mistaken as to the validity of its demand and

B  its ability to apply the money to upgrading the lifts, its change of position was bona fide. Thirdly, however, it would not have been inequitable to require the appellant to make restitution in full. According to Lord Goff:

> ... the mere fact that the defendant has spent the money, in whole or in part, does not of itself render it inequitable that he should be called upon to repay, because *the expenditure might in any event have been incurred by him in the ordinary course of things.* [Emphasis is added.]

C

This was because, firstly, the judge had found that the appellant would have upgraded the lifts in any case (see ¶7). Furthermore, as the need for upgrading was not shown to be due, even in part, to the respondent's proposed subdivision, the appellant was not allowed to retain any part of the $200,000. Secondly, the

D  appellant's demand was ultra vires.

37  Could the appellant rely on this defence with regards to the $170,000? As there was no evidence as to how the $170,000 was spent, the first requirement — that the appellant had changed its position — was not even met.

E  *Sixth issue: defences raised on appeal*

38  On appeal, the appellant raised the following defences for the first time. The principles governing such situations are found in *A-G- for the Straits Settlements v Pang Ah Yew* [1934] MLJ 184, which cited Lord Herschell in *The Tasmania* (1890) 15 App Cas 223 at 225:

F

> ... a Court of Appeal ought only to decide in favour of an appellant on a ground there put forward for the first time, if it be satisfied beyond doubt, first, that *it has before it all the facts bearing upon the new contention, as completely as would have been the case, if the controversy had arisen at the trial*; and next that *no satisfactory explanation could have been offered by those whose conduct is impugned if an opportunity for explanation had been afforded them when in the witness box.* [Emphasis is added.]

G

39  As we state below that 'honest receipt' and 'estoppel by convention' are not acceptable defences, the above principles were applied only to the other grounds raised. The facts necessary for deciding whether the defences are made out were:

(1) Honest claim: the payee's state of mind at the time of demand; and the payer's

H  state of mind at the time of payment.

(2) Compromise: the payer's state of mind at the time of payment.

(3) Abuse of process: the respondent's state of mind at the time of the earlier suit in 1992.

As for the first principle, these facts did not go beyond those which were necessary

I  for deciding whether the payment had been made under a mistake of law. As for the second principle, it was the respondent whose conduct was impugned, whether by the suggestion that it knew or believed that the claim was invalid or was

A

indifferent as to whether it was invalid. The respondent did not have to do more to prove its state of mind at the relevant time, than it had to for the purposes of showing that it had made a mistake of law. Hence the appellant was allowed to raise these new grounds.

B

SETTLEMENT OF AN HONEST CLAIM AND COMPROMISE

40   These defences were recognised in *Kleinwort Benson* (supra), though Lord Goff said there was uncertainty as to the scope of the former (see ¶35). The elements of the defence of settlement of an honest claim are:

(1)   the payee honestly believes that he can legitimately demand payment; and

C

(2)   the payer knows or believes that the payee's claim has no legal basis.

Element '(1)' was met (see ¶25). However, element '(2)' was not: the respondent believed that the appellant had the authority to impose the conditions (see ¶26).

41   To satisfy the defence of compromise, it must be shown that the payer was indifferent as to whether the payee's claim had a legal basis. The discussion above has concluded that, far from being indifferent, the respondent believed that the appellant's demands were legal (see ¶26). The payee's state of mind was irrelevant.

D

HONEST RECEIPT

E

42   The appellant cited Brennan J (as he then was) in *David Securities v Commonwealth Bank of Australia* (1992) 175 CLR 353 as support that this was a defence to a claim founded on mistake of law. This defence has not been embraced by other courts. It was in fact criticised by Lord Goff in *Kleinwort Benson* (supra at pp 540–541):

F

> ... Brennan J's proposed defence is so wide that, if it was accepted, these other defences would in practice cease to have any relevance in the case of money paid under a mistake of law. Moreover in many cases of this kind the mistake is shared by both parties ... In such cases, recovery by the plaintiff would automatically be barred by Brennan J's proposed defence.

We do not recognise this as a defence either.

G

ESTOPPEL BY CONVENTION

43   According to 16 *Halsbury's Laws of England* (4th Ed) (1992 Reissue) para 1070, the scope of this estoppel is still unclear. It was not appropriate at this juncture to accept it as a defence.

H

44   In any case, the appellant failed on this point. Firstly, the above-mentioned passage in *Halsbury*'s defines 'estoppel by convention' as:

> Where parties *to a contract* put a particular interpretation on it by a course of dealing on the faith of which each of them to the knowledge of the other acts and conducts their mutual affairs, they are bound by that interpretation. [Emphasis is added.]

I

As the parties' relationship was not contractual, the appellant could not rely on this doctrine. Secondly, the court would only uphold the common assumption if it

A would be unconscionable not to do so. As the judge found that the appellant had suffered no prejudice (see ¶34), it was not unconscionable not to give effect to any common assumption which existed. Thirdly, this estoppel cannot be raised to deny one the protection afforded by a statute, the terms of which cannot be circumvented by contract. The discussion of the first and second issues (see ¶6–16) concluded that the relevant LTSA provisions could not be contracted out from.

B

ABUSE OF PROCESS/EXTENDED RES JUDICATA

45    The appellant said that the respondent had an opportunity to raise the issues in its counterclaim when it was sued by the appellant in 1992. The simple answer to this was that the respondent did not know of, and could not reasonably have known of, its claim at that time.

C

*Seventh issue: whether other defences should be recognised*

46    It may be fortunate that the Singapore courts can draw on the jurisprudence of other courts in this area, but no body of judge-made law comes ready-made. As was said by Lord Goff in *Kleinwort Benson* (supra at p 541):

D

> The proper course is surely to identify particular sets of circumstances which, as a matter of principle or policy, may lead to the conclusion that recovery should not be allowed; and in so doing to draw on the experience of the past, looking for guidance in particular from the analogous case of money paid under a mistake of fact, but also drawing upon the accumulated wisdom to be found in the writings of scholars on the law of restitution.

E

The following issues were not raised in this case, but it was necessary to examine them to delineate — however imprecisely — the scope of the new rule. In particular, this would give Parliament an indication of the courts' stand on this area of law, should it later wish to pass relevant legislation.

F

PAYMENT MADE UNDER A CLOSED TRANSACTION

47    The main argument against allowing recovery after the transaction in which the money was paid has been closed, is that everyone who has paid money under a mistake of law can sue for its return, subject to any applicable time bar and laches. As mentioned, this would not bring about any different from legislative intervention with retrospective effect (see ¶23). Any worries about opening the floodgates can, however, be addressed through the rules on payments made under a settled view of the law. Lord Goff also thought that certain defences would 'protect the stability of closed transactions'.

G

H

48    The reasons for allowing recovery in respect of closed transactions are as follows. Firstly, not allowing recovery would defeat the policy behind the relevant law (about which one or both parties were mistaken). In *Kleinwort Benson*, Lord Goff said (supra at p 543):

I

> … it is incompatible with the ultra vires rule that an ultra vires transaction should become binding on a local authority simply on the ground that it has been completed.

Secondly, allowing recovery when transactions are still open, but not when they are closed, will lead to capricious results. It may simply be a question of luck whether the mistake of law is, or could have been, discovered before or after the transaction is concluded.

PAYMENT MADE UNDER A SETTLED VIEW OF THE LAW

49   The majority in *Kleinwort Benson* (supra) ruled that this was not a defence to a restitutionary claim, but the minority thought that it should have been. The majority's view can be summarised as follows. Judges merely 'declare' what the law is; they do not change the law but merely correct what was an incorrect view of the law. This correct view of the law is retrospectively imposed, such that the payer's belief at the time of payment — which may have been correct according to the earlier view of the law — is on hindsight deemed incorrect. Hence he had paid out under a mistake of law, and should be allowed to recover the money.

50   The minority opposed this for two reasons. Firstly, the declaratory theory of law is artificial, and it should be recognised that judges make and change the law. If the payer's belief at the time of payment was in line with settled law, he was not mistaken. Even if the law is changed with retrospective effect, his state of mind could not be so changed. Secondly, allowing such a defence would further undermine the finality of closed transactions. While it is accepted above that the fact that a transaction is closed per se should not be a defence, it would be undesirable to allow a transaction to be reopened merely because it had been made under a settled view of law which has been changed. Lord Browne-Wilkinson cautioned in *Kleinwort Benson* (supra at p 523):

> On every occasion in which a higher court changed the law by judicial decision, all those who had made payments on the basis that the old law was correct (however long ago such payments were made) would have six years in which to bring a claim to recover money paid under a mistake of law.

It should be noted that, as *Kleinwort Benson* involved contracts, the limitation period for claims arising therefrom was six years. If, however, an area of law not covered by the Limitation Act was changed, persons who had made payments in reliance of the old law would have an unlimited period (subject to laches) in which to recover their money.

51   The LRC of the SAL preferred the minority position. It also pointed out that other jurisdictions which have abrogated the rule have not accepted this defence. The key issue is how a 'change in the settled view of the law' should be defined, and whether it can be defined with sufficient precision as to avoid much litigation. The LRC of the SAL recommended that:

(1)   'Settled law' means:

   (a)   there is binding judicial authority on the specific point; and
   (b)   if there is no such authority, a lawyer who was reasonably experienced in the relevant field would have advised the payer to make the payment.

(2)   A change in the settled law can only be brought about by judicial decision.

A    We think that this should be accepted as a defence, and that the definition of the LRC of the SAL should be adopted.

PROMISSORY ESTOPPEL

B    52    Goff and Jones (*The Law of Restitution*) suggest that, in the context of restitutionary claims, the defence of promissory estoppel cannot exist comfortably with that of change of position. In *Avon County Council v Howlett* [1983] 1 All ER 1073; [1983] 1 WLR 605, the court held that estoppel cannot operate pro tanto, such that:

C    ... if the defendant has innocently changed his position by disposing of part of the money, a defence of estoppel would provide him with a defence to the whole of his claim.

In contrast, the defence of change of position will only allow the payee to keep that part of the money which he has disposed of. Given that change of position has been specifically recognised as a defence in *Kleinwort Benson* (supra), it is
D    unlikely that promissory estoppel will be accepted as a defence to a restitutionary claim.

PASSING-ON THE BURDEN OF THE PAYMENT

E    53    Such a situation arises where X demands that Y pay a tax, which Y pays. Y then passes on the tax to Z, for example, by incorporating it in the price of goods which he sells to Z. According to Evans LJ said in *Kleinwort Benson v Birmingham City Council* [1996] 4 All ER 733; [1996] 3 WLR 1139, this defence is not available in the context of private law claims.

F    *Eighth issue: interest awarded to the respondent*

54    The authorities cited by the respondent related to situations in which the judge could award interest pursuant to what is now s 12 of the Civil Law Act (Cap 43, 1999 Ed). This provides:

G    (1)    In any proceedings tried in any court of record for the recovery of any debt or damages, the court may, if it thinks fit, order that there shall be included in the sum for which judgment is given *interest at such rate as it thinks fit* on the whole or any part of the debt or damages *for the whole or any part of the period between the date when the cause of action arose and the date of the judgment.* [Emphasis is added.]

H    This is in pari materia with s 3(1) of the Law Reform (Miscellaneous Provisions) Act 1934 in England. The words 'any debt or damages' were construed by the House of Lords in *BP Exploration Co (Libya) v Hunt (No 2)* [1983] 2 AC 352 at 373; [1982] 1 All ER 925 at 992:

I    ... the words "any debt or damages", in the context in which they occur, are very wide, so that they cover any sum of money which is recoverable by one party from another, either at common law or in equity or under a statute of the kind here concerned.

Hence the judge had the power to award interest on these sums.

55   The first issue was whether the judge could have awarded interest for the period that she did. The appellant pointed out that s 12(1) only allows for interest to be awarded from the date the cause of action arose. It added that, since the respondent could not have known of its right to recover the money until the date of the judgment below, interest should only have run from that date. Although *BP Exploration* dealt with frustration of contract, the reasoning applied equally here because the common rationale was to prevent injustice to a successful plaintiff ([1983] 2 AC 352 at 374; [1982] 1 All ER 925 at 992):

> … there cannot be any general rule that, whenever the amount of any debt or damages payable by one party … to the other cannot be ascertained until judgment is given, the court should never … award interest from a date earlier than the date of such judgment. To apply such a rule would, in my opinion, be plainly inconsistent with the express terms of s 3(1) [of the English Act], and in many cases … work *serious injustice on a successful plaintiff.* [Emphasis is added.]

Hence the judge could exercise her discretion to award interest from the dates that she did.

56   The second issue was whether the judge was able to award interest at the rate she did. We saw no reason to interfere with her decision to award interest at five percent on the sums up to June 1995. However, we did not think that she should have linked her decision to award interest at ten percent thereafter to the rate which the appellant was entitled to collect for the maintenance arrears. They were unrelated causes of action. Interest from July 1995 should be at the more usual rate of six per cent.

*Ninth issue: costs*

PARTY-AND-PARTY COSTS IN GENERAL

57   The principles governing the award of costs are elucidated in *Re Elgindata (No 2)* [1993] 1 All ER 232, and adopted in Singapore in *Tullio v Maoro* [1994] 2 SLR 489. The relevant passage in *Re Elgindata (No 2)* provides (at p 237):

> The principles are these. (1) Costs are in the discretion of the court. (2) They should follow the event, except when it appears to the court that … some other order should be made. (3) The general rule does not cease to apply simply because the successful party raises issues or makes allegations on which he fails, but where that has caused a significant increase in the length or cost of the proceedings he may be deprived of the whole or a part of his costs. (4) Where the successful party raises issues or makes allegations improperly or unreasonably, the court may not only deprive him of his costs but order him to pay the whole or a part of the unsuccessful party's costs … the fourth implies that a successful party who neither improperly nor unreasonably raises issues or makes allegations on which he fails ought not to be ordered to pay any part of the unsuccessful party's costs.

As the respondent was the successful party below, according to principle (2), prima facie, it should be awarded costs. As for principle (3), the starting point was that the respondent failed on one ground, *colore officii*. However, it should not be deprived of its costs. Firstly, the trial ended within the allotted time. Secondly, as the respondent relied on the same facts for proving mistake of law and for proving *colore officii*, and as the appellant relied on the same defences to both claims, it

Case3:05-cv-00646-EMC    Document209-2    Filed12/14/09    Page67 of 67

A   was unlikely that the respondent's pleading *colore officii* caused a significant increase in the cost of the proceedings. The respondent had also paid costs to the appellant for the late amendment of its pleadings. Since it was not alleged that the respondent had raised issues improperly or unreasonably, according to principle (4), it was not ordered to pay the appellant's costs.

B   58    The court said in *Tullio v Maoro* (supra at p 496):

> Although the question of costs is always in the discretion of the court and an appellate court will not readily interfere with the proper exercise of that discretion, an appellate court should not hesitate to interfere where the discretion has been manifestly exercised wrongly or exercised on wrong principles.

C   As the judge did not exercise her discretion wrongly nor on wrong principles, there was no reason to overturn her order on costs.

COSTS OF MORE THAN ONE SOLICITOR

D   59    Both parties asked the court to certify costs for more than one solicitor under O 59 r 19 of the Rules of Court:

> (1)    Costs for getting up the case by and for attendance in Court of more than one solicitor for a party shall not be allowed unless the Court at the hearing or within 7 days thereof so certifies.

E   
> (2)    Such costs may be allowed notwithstanding that the solicitors are members of the same firm of solicitors.

We think that the requests were justified. The issues in this appeal were numerous and entailed consideration of reform of the law of Singapore. The lengthy submissions and large number of authorities cited also showed that considerable

F   effort must have been expended.

*Conclusion*

60    We recognise the following as specific defences to a claim for money paid out under a mistake of law: settlement of an honest claim; compromise; change of

G   position; payment made under a settled view of the law; and perhaps in non-private law claims, passing on the burden of payment. Lord Goff was alive to the possibility that other defences may be developed. We do not think that the following should be defences to such a claim: payment made under a closed transaction; honest receipt; promissory estoppel; and estoppel by convention. For these reasons, we dismissed the appeal.

H   
61    We awarded the costs of this appeal to the respondent. We certified that costs for two solicitors be allowed. We also ordered that the security for costs and any accrued interest be released to the respondent to account of costs.

I   *Appeal dismissed.*

Reported by Teo Hsiao-Huey